## In re AMERICAN CONTINENTAL CORPORATION/LINCOLN SAVINGS AND LOAN SECURITIES LITIGATION.

### MDL No. 834.

United States District Court,
D. Arizona.

June 18, 1992.

William S. Lerach, Leonard B. Simon, John J. Stoia, Jr., Milberg Weiss Bershad Specthrie & Lerach, Kirk B. Hulett, Barrack, Rodos & Bacine, San Diego, Cal., for Shields CIV 90–566 PHX–RMB.

Joseph W. Cotchett, Susan Illston, Allan Steyer, Michael Liberty, Cotchett, Illston & Pitre, Burlingame, Cal., Ronald Rus, Randall A. Smith, Alvarado, Rus & Worcester, Orange, Cal., for First Baptist CIV 90–570 PHX–RMB.

P. John Owen, Michael C. Manning, Kristin L. Farnen, Morrison & Hecker, Phoenix, Ariz., for plaintiff Resolution Trust Corp. CIV 89–1509 PHX–RMB and defendant Lincoln Sav. and Loan Ass'n.

Andrew S. Friedman, Bonnett, Fairbourn & Friedman, Phoenix, Ariz., for Shields and Sidney Kaufman CIV 90–574 PHX–RMB.

Patrick J. Grannan, Greenfield & Chimicles, Los Angeles, Cal., for Shields, Mary Doran CIV 90–569 PHX–RMB and Ronald Fischman CIV 90–567 PHX–RMB.

Richard D. Greenfield, R. Bruce McNew, Greenfield & Chimicles, Haverford, Pa., for Shields and Ronald Fischman.

Kevin P. Roddy, Milberg, Weiss, Bershad, Specthrie & Lerach, Los Angeles, Cal., Richard S. Wayne, Strauss & Troy, Cincinnati, Ohio, Robert S. Schachter, Zwerling, Schachter & Zwerling, New York City, for Shields.

Thomas L. Taylor, III, Barry Mallen, Cooper, Epstein & Hurewitz, Beverly Hills, Cal., for Alan H. Yahr, CIV 90–571 PHX–RMB.

Thomas R. Schuck, Taft, Stettinius & Hollister, Cincinnati, Ohio, Richard C. Field, Cadwalader, Wickersham & Taft, Los Angeles, Cal., for Star Bank, N.A., Cincinnati.

Wayne W. Smith, Gail E. Lees, Gibson, Dunn & Crutcher, Los Angeles, Cal., John T. Behrendt, Gregory Barton, Gibson, Dunn & Crutcher, New York City, for Touche Ross & Co.

Dan K. Webb, Thomas J. Frederick, Winston & Strawn, Chicago, Ill., for Lexecon, Inc.

Max Gillam, Nancy Scheurwater, Latham & Watkins, Los Angeles, Cal., for Jones, Day, Reavis & Pogue and William J. Schilling, Ronald Fein and Robert.

James R. Condo, Snell & Wilmer, Phoenix, Ariz., for Troutman, Sanders, Lockerman & Ashmore.

Edward M. Glennon, Terrence J. Fleming, Steven M. Pincus, Lindquist & Vennum, Minneapolis, Minn., for First Bank Nat. Ass'n (formerly First Bank of Minneapolis).

Timothy A. Meltzer, David J. Brown, Brobeck, Phleger & Harrison, San Francisco, Cal., for Indus. Indem. Corp. CIV 90–1843 PHX–RMB.

Frank Taylor, Popham, Haik, Schnobrich & Kaufman, Ltd., Minneapolis, Minn., for Offerman & Co., Joseph Offerman and Scott Offerman.

Robert Ted Parker, Jeffrey B. Kirschenbaum, Titchell, Maltzman, Mark, Bass, Ohleyer & Mishell, A Professional Corp., San Francisco, Cal., for Societe D'Analyses et D'Etudes Bretonneau (f/k/a Societe de Banque Privee and Saudi European Bank).

Stuart L. Kadison, James Goldman, Sidley & Austin, Los Angeles, Cal., for Arthur Andersen & Co.

Miles N. Ruthberg, Meryl Macklin, Heller, Ehrman, White & McAuliffe, Los Angeles, Cal., for Arthur Young & Co., Ernst & Young and Jack Atchison.

Charles W. Cunningham, Michael A. Piazza, McKool Smith, Dallas, Tex., for Gene E. Phillips.

Terrence B. Adamson, Lynn Fisher Hill, Jack D. Worland, Jr., Donovan, Leisure, Rogovin, Huge & Schiller, Washington, D.C., for Saudi European Inv. Corp. N.V. (SEIC), Alef Inv. Corp., Alef Bank, S.A. and Jamal Radwan.

H. Garrett Frey, pro se.

Stephen C. Neal, Kirkland & Ellis, Chicago, Ill., for Charles H. Keating, Jr., Charles H. Keating, III, Robert M. Wurzelbacher.

## MEMORANDUM OPINION

BILBY, District Judge.

This Opinion describes the basis of this court's rulings by Order of February 14, 1992, on motions for summary judgment filed by parties to these consolidated actions.

## I. PROCEDURAL HISTORY

Five separate actions are consolidated before this court. *Sarah B. Shields v. Charles H. Keating, Jr.* ("*Shields*"), a class action on behalf "all persons who purchased securities, stock or debentures, of American Continental Corporation ("ACC") between January 1, 1986 and April 14, 1989," *Shields v. Keating,* No. CV 89–2052 SVW (C.D.Cal.1989) (Order re Class Certification), was transferred to this court by the Judicial Panel on Multidistrict Litigation. The *Shields* Plaintiffs fall into two categories. The majority purchased unsecured subordinated debentures through branch offices of Lincoln Savings & Loan Association ("Lincoln" or "Lincoln Savings"), a wholly owned subsidiary of ACC. Others purchased stock or debentures through broker/dealers. *Shields* alleges the following violations: Section 10(b) of

the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b–5, 15 U.S.C. § 78j(b), 17 C.F.R. 240.10b–5; Section 18 of the Exchange Act, 15 U.S.C. § 78r; the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.;* the Arizona Racketeering Act ("AZRAC"), 13 A.R.S. § 13–2301 *et seq.,* and; Sections 11 and 12 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77k, 77*l.*

*Charles Roble v. Arthur Young & Co.* ("*Roble*"), a state action on behalf of the same class of securities purchasers, states claims for fraud, negligent misrepresentation, breach of fiduciary duty, and violations of California Corporations Code Sections 1507 and 25401.

Also before the court are federal and state actions on behalf of approximately 100 individual ACC securities purchasers. *Alan H. Yahr v. Lincoln Sav. & Loan Ass'n* ("*Yahr*"). The *Yahr* plaintiffs allege violations of Section 10(b), RICO, negligent misrepresentation, breach of fiduciary duty, conspiracy to breach fiduciary duty, California Corporations Code Section 25401, Sections 11 and 12(2) of the Securities Act, professional negligence, and negligent infliction of emotional distress.

In *Resolution Trust Corp. v. Charles H. Keating, Jr.* ("*RTC v. Keating*"), the Resolution Trust Corporation ("RTC"), as receiver for Lincoln, brings claims under RICO, AZRAC, and various state and common law theories of liability.

Finally, this opinion addresses claims made in *Frey v. Hotel Pontchartrain Ltd. Partnership* ("*Frey*"), in which investors in an ACC-related limited partnership brought claims for securities fraud, RICO, unjust enrichment, and negligent misrepresentation.

These actions originate from the business dealings of Charles H. Keating, Jr. ("Keating"), former chairman of ACC. The claims at issue here were brought principally against professionals who provided services to ACC and/or Lincoln Savings. These include: Star Bank, an indenture trustee for ACC subordinated debt; Lexecon Inc. ("Lexecon"), an economic consult-

ing firm; Offerman & Company, Joseph Offerman, and Scott Offerman ("Offerman"), an underwriting firm and its principals; Arthur Andersen & Co. ("Arthur Andersen"), Arthur Young & Co. ("Arthur Young"), and Touche Ross & Co. ("Touche"), accounting firms; Jones, Day, Reavis & Pogue ("Jones Day"), a Cleveland-based law firm and two of its individual partners; Troutman, Sanders, Lockerman and Ashmore ("Troutman"), an Atlanta based law firm; Societe D'Analyses et D'Etudes Bretonneau ("Bretonneau"), a French bank; First Bank National of Minneapolis ("First Bank"), former trustee of the ACC employee stock ownership plan ("ESOP"); Gene E. Phillips, former chairman of Southmark Corporation; and Industrial Indemnity Corporation ("Industrial Indemnity" or "Indemnity"), a surety.

On February 14, 1992, following lengthy discovery, extensive briefing and oral argument, and after a review of voluminous pleadings, depositions, exhibits, and other papers, this court ruled on numerous motions for summary judgment. *See In re ACC/Lincoln Savings Securities Litigation*, MDL 834 (D.Ariz. February 14, 1992) (Order Granting and Denying Summary Judgment). At that time, the court stated that it would in due course issue this Memorandum Opinion, setting forth its analysis supporting the decision to grant or deny, in whole or in part, the various motions for summary judgment.

In addition, on January 7, 1992, this court issued a Memorandum Opinion and Order setting forth the basis for its rulings on Defendants' Motions for Class Decertification, and describing the legal basis for its decision that the plaintiff class is entitled to a presumption of reliance on the fraud-based claims discussed herein. *See In re ACC/Lincoln Savings Securities Litiga-*

*tion,* 140 F.R.D. 425 (D.Ariz.1992) (Memorandum Opinion and Order Denying Motions for Class Decertification). That Opinion is incorporated by reference herein, and forms the basis for this court's denial of summary judgment on reliance-based grounds.

## II. LAW OF GENERAL APPLICATION

### *Section 10(b) of the Exchange Act*

■ Rule 10b–5, implementing Section 10(b) of the Exchange Act,[1] provides:

It shall be unlawful for any person ...

1. to employ any device, scheme, or artifice to defraud,

2. to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

3. to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5. Therefore, a primary violation of Section 10(b) and Rule 10b–5 entails: (1) a scheme or artifice to defraud; (2) an affirmative misrepresentation or omission of a fact necessary to make other statements not misleading; or (3) a course of business which operates as a fraud or deceit. In addition, the act or omission must be made or conducted "in connection with" the purchase or sale of securities, with resultant damage to plaintiffs. *Levine v. Diamanthuset, Inc.,* 950 F.2d 1478, 1485 (9th Cir.1991).

■ Proof of scienter is a requisite to any 10b–5 action. The United States Su-

---

1. Section 10(b) of the Exchange Act provides, in pertinent part:

 Section 10. It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality, of interstate commerce or of the mails, or of any facility of any national securities exchange—

 \* \* \* \* \* \*

 (b) To use or employ, in connection with the purchase or sale of any security registered

 on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

 15 U.S.C. § 78j(b).

preme Court has defined scienter as "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 1381 n. 12, 47 L.Ed.2d 668 (1976). In *Hollinger v. Titan Capital Corp.,* 914 F.2d 1564 (9th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1621, 113 L.Ed.2d 719 (1991), the Ninth Circuit adopted a standard for the minimal culpable mindset, referred to hereinafter by this court as "reckless scienter." The Ninth Circuit held:

> [R]eckless conduct may be defined as the highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, which presents a danger of misleading buyers or sellers that is either known to the defendant or so obvious that the actor must have been aware of it.

*Id.* at 1569 (quoting *Sundstrand Corp. v. Sun Chem. Corp.,* 553 F.2d 1033, 1044–45 (7th Cir.), *cert. denied,* 434 U.S. 875, 98 S.Ct. 224, 225, 54 L.Ed.2d 155 (1977)). The *Hollinger* court observed that "the danger of misleading buyers must be actually known or so obvious that any reasonable [person] would be legally bound as knowing, and the omission must derive from something more egregious than even 'white heart/empty head' good faith." *Id.* at 1569–70. Thus, the court concluded, "recklessness is a lesser form of intent rather than a greater degree of negligence." *Id.* at 1569.

■ To establish that a defendant's alleged misconduct was "in connection with" the purchase or sale of a security, three elements must be satisfied. First, there must be a causal connection between the alleged fraud and the plaintiff's injury. *Jett v. Sunderman,* 840 F.2d 1487, 1494 (9th Cir.1988); *In re Fin. Corp. of America Shareholder Litigation,* 796 F.2d 1126, 1130 (9th Cir.1986) *("In re FCA");* *Levine,* 950 F.2d at 1485 (causal connection between defendant's misrepresentations and plaintiff's injury required). Second, there must be a connection between the defendant's alleged misrepresentations or fraudulent course of conduct and the securities

at issue. *Id.* The "in connection with" requirement demands "something more than any fraud tangentially related to a securities transaction." *Id.* And finally, the purchase or sale of securities must be the proximate cause of the plaintiff's injuries. *Id.* at 1486. The Ninth Circuit has held:

> The three parts of the 'in connection with' requirement thus represent three lines with which one might form a triangle. Only if each of the three lines are of sufficient length to bridge the distances between three points—identified by (A) a defendant's material misrepresentation or omission, (B) a plaintiff's injury, and (C) a security—will a Rule 10b–5 cause of action be pleaded and proved.

*Id.* In assessing these three fundamental criteria, Section 10(b) is to be read flexibly. *Superintendent of Ins. v. Bankers Life & Casualty Co.,* 404 U.S. 6, 12, 92 S.Ct. 165, 168, 30 L.Ed.2d 128 (1971); *In re FCA,* 796 F.2d at 1129. "When there is a sale of a security and fraud 'touches' the sale, there is redress under Section 10(b). It does not matter that the fraud is not the 'garden variety' associated with securities sales." *Arrington v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.,* 651 F.2d 615, 619 (9th Cir.1981) (citation omitted); *In re FCA,* 796 F.2d at 1130.

■ Aiding and abetting securities fraud—or secondary liability—requires proof of the following elements: (1) the existence of an independent primary wrong; (2) knowledge by the alleged aider and abetter of the wrong and of his or her role in furthering it; and (3) substantial assistance in the wrong. *Levine,* 950 F.2d at 1483; *Roberts v. Peat, Marwick, Mitchell & Co.,* 857 F.2d 646, 652 (9th Cir.1988) (per curiam), *cert. denied,* 493 U.S. 1002, 110 S.Ct. 561, 107 L.Ed.2d 556 (1989). As with a primary violation, a defendant must know of the fraud, or recklessly disregard it. *Levine,* 950 F.2d at 1483.

■ Proof of substantial assistance requires a showing that the defendant's assistance was a substantial factor in causing

the plaintiff's harm. *Mendelsohn v. Capital Underwriters, Inc.,* 490 F.Supp. 1069, 1084 (N.D.Cal.1979). "Substantial assistance means more than a little aid." *Barker v. Henderson, Franklin, Starnes & Holt,* 797 F.2d 490, 496 (7th Cir.1986). Where substantial assistance is premised on actual misrepresentations, the *Hollinger* standard applies. *Levine,* 950 F.2d at 1484. If aiding and abetting liability is to be premised exclusively on silence or inaction, it may be necessary for the court to consider whether a defendant operates under a duty of disclosure. *Levine,* 950 F.2d at 1484, n. 4; *See also Woodward v. Metro Bank of Dallas,* 522 F.2d 84 (5th Cir.1975). "When it is impossible to find any duty of disclosure, an alleged aider-abettor should be found liable only if scienter of the high 'conscious intent' variety can be proved. Where some special duty of disclosure exists, then liability should be possible with a lesser degree of scienter." *Id.* at 97.

### Section 11 of the Securities Act

██ Section 11 of the Securities Act provides that every person who acquires a security burdened by an untrue statement or omission of material fact may sue: (1) every person who signed the registration statement; (2) every director and officer of the offeror; (3) "every accountant, engineer, or appraiser, or any person whose profession gives authority to a statement made by him, who has with his consent been named as having prepared or certified" any part of the registration statement or any report or valuation used in connection with it; and/or (4) every underwriter with respect to such security. 15 U.S.C. § 77k.

A purchaser's reliance on the registration statement need not be proven unless the plaintiff "acquired the security after the issuer made generally available to its security holders an earning statement covering a period of twelve months beginning after the effective date of the registration statement." 15 U.S.C. § 77k. Section 77k further provides that reliance may be shown without proof that the plaintiff read the registration statement.

### Section 12 of the Securities Act

Section 12 of the Securities Act imposes liability on those who offer or sell unregistered securities, and those who sell securities by means of material misrepresentations or omissions in prospectuses or oral communications. 15 U.S.C. § 77*l.*

### Section 18 of the Exchange Act

Section 18 of the Exchange Act provides that any person who makes or causes to be made false or misleading statements in a document filed with the Securities and Exchange Commission ("SEC") shall be liable to any person who buys or sells securities in reliance on such statements. 15 U.S.C. § 78r.

### Racketeering Influenced and Corrupt Organizations Act

Section 1962(c) of RICO provides:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). RICO also provides that it is unlawful for any person to conspire to violate subsection (c). 18 U.S.C. § 1962(d). The Code defines "racketeering activity" as any act indictable under various provisions of Title 18, including § 1341 relating to mail fraud, § 1343 relating to wire fraud, and "any offense involving fraud connected with a case under Title 11, fraud in the sale of securities...." 18 U.S.C. § 1961(1).

██ To establish a RICO claim, plaintiffs must prove defendants intended to devise and did devise a scheme to defraud. *United States v. Bohonus,* 628 F.2d 1167 (9th Cir.), *cert. denied,* 447 U.S. 928, 100 S.Ct. 3026, 65 L.Ed.2d 1122 (1980). "The scheme must be reasonably calculated to deceive persons of ordinary prudence and comprehension." *Id.* at 1172. "Thus, the fraud must be active, not merely constructive."

*Id.* Intent may be shown by examining the scheme itself. *Id.* "The fraudulent scheme need not be one which includes an affirmative misrepresentation of fact, since it is only necessary [to prove] that the scheme was calculated to deceive persons of ordinary prudence." *Id.* at 1172. "[D]eceitful concealment of material facts is not constructive fraud but actual fraud." *Id.* (citing *Cacy v. United States,* 298 F.2d 227, 229 (9th Cir.1961)).

■ The standard for aiding and abetting a RICO violation parallels that under Section 10(b). *See Oscar v. University Students Co-op. Ass'n,* 939 F.2d 808, 809 n. 1 (9th Cir.1991) (citing *Petro–Tech, Inc. v. Western Co. of North America,* 824 F.2d 1349 (3rd Cir.1987)). A defendant must have knowledge or act with reckless scienter. *See* discussion of Section 10(b) standards, *supra.* This court has previously applied the reckless scienter standard to a RICO aiding and abetting action. *In re ACC/Lincoln Savings Securities Litigation,* 782 F.Supp. 1382 (D.Ariz.1991) (Memorandum Opinion and Order granting summary judgment to Bankers Trust Company).

### Arizona RICO ("AZRAC")

■ To establish a primary violation of AZRAC, plaintiffs must prove defendants were associated with an enterprise and conducted or participated in the conduct of such enterprise's affairs through racketeering. A.R.S. § 13–2312. 'Racketeering' is defined, in pertinent part, to include any act, "committed for financial gain which is chargeable or indictable under the laws of this state and punishable by imprisonment for more than one year," including:

(r) Fraud in the sale of securities.

(t) A scheme or artifice to defraud.

A.R.S. 13–2301(D)(4).

The definition of "fraud in the sale of securities" parallels Rule 10b–5. A.R.S. § 44–1991; *see* discussion of Rule 10(b) standards; *supra.* A "scheme or artifice to defraud" involves a plan to knowingly obtain benefit by means of false or fraudulent pretenses, representations, promises or material omissions. A.R.S. § 13–2310.

### California Corporations Code

Section 1507 of the California Corporations Code imposes liability on any corporate director, officer, employee, or agent who publishes a prospectus, report, financial statement or other public document which is false in any material respect, or who falsifies or erases in any material aspect the books, minutes, records, or accounts of a corporation. Cal.Corp.Code § 1507.

■ It is a violation of Section 25401 of the Code to sell securities through written or oral communications which are materially untrue or omit to state material facts. Under Section 25401, proof of reliance is unnecessary. While sellers violating Section 25401 are liable to their purchasers, Section 25504.1 imposes joint and several liability on those who materially assist violations of Section 25401 with intent to deceive or defraud. Cal.Corp.Code §§ 25401 and 25504.1.

### Common Law Fraud and Negligent Misrepresentation

■ Under California common law, an action for fraud and deceit requires proof of: (1) a false representation; (2) knowledge of the falsity; (3) an intent to induce reliance; (4) actual and reasonable reliance; and (5) resulting damage to the plaintiff. Secondary liability, or aiding and abetting, is defined in Restatement (Second) of Torts, 876b. It requires proof of knowledge of the primary violation, which may be inferred from the circumstances, and substantial assistance, which may be in the form of encouragement or advice. *Pasadena Unified School Dist. v. Pasadena Federation of Teachers,* 72 Cal. App.3d 100, 140 Cal.Rptr. 41 (1977). The aider and abetter's conduct must be a substantial factor in causing the plaintiff's harm. Rest.2d of Torts § 876 and comments.

■ A negligent misrepresentation claim involves the following elements: (1) a misrepresentation of past or existing material facts; (2) a lack of reasonable grounds

for believing in the truth of the representation; (3) an intent to induce reliance; (4) actual and justifiable reliance; and (5) resulting damage.

### Conspiracy

 A conspiracy involves a knowing agreement by two or more persons to take concerted action to commit an illegal act. *Wyatt v. Union Mortgage Co.*, 24 Cal.3d 773, 598 P.2d 45, 157 Cal.Rptr. 392 (1979). The existence of a conspiracy may be inferred from the nature of the acts, the relation of the parties, the interests of the conspirators, or other circumstances. *Id.* Express agreement or tacit consent will, if proven, suffice to create liability. *Id.; see also* Rest.2d of Torts § 876(a).

 Where the objective of a conspiracy has not yet been achieved when a co-conspirator manifests his or her agreement to further the objective, the co-conspirator becomes liable for all acts done in furtherance of the common objective, including acts previously done. This is so "irrespective of whether or not [the conspirator] was a direct actor and regardless of the degree of his activity." *Id.; De Vries v. Brumback*, 53 Cal.2d 643, 2 Cal. Rptr. 764, 349 P.2d 532 (1960); *see also Sawyer v. First City Fin. Corp.*, 124 Cal. App.3d 390, 177 Cal.Rptr. 398 (1981). A conspirator may not be held liable for an offense committed before his or her agreement to join the conspiracy, if that prior offense completed the ultimate objective of the conspiracy. *People v. Marks*, 45 Cal.3d 1335, 248 Cal.Rptr. 874, 756 P.2d 260 (1988). The distinction turns on whether the goal of the common design has been achieved with finality, as the murder in *People v. Marks, supra*, or is ongoing in nature, as the conversion in *De Vries v. Brumback, supra*.

### Negligent Infliction of Emotional Distress

 To prove a claim for negligent infliction of emotional distress under California law, "a plaintiff must either have a special relationship to the defendant, be the object of some aspect of the defendant's conduct, or personally witness the negligently caused physical injury to a closely related primary victim." *Holliday v. Jones*, 215 Cal.App.3d 102, 264 Cal.Rptr. 448 (4th Dist.1989). Moreover, the defendant must commit "outrageous conduct ... so extreme as to exceed all bounds of that usually tolerated in a civilized community." *Molien v. Kaiser Foundation Hospitals*, 27 Cal.3d 916, 167 Cal.Rptr. 831, 616 P.2d 813 (1980).

### III. SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides, in pertinent part, that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Whether a fact is material depends on the substantive law at issue. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

In essence, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. at 2512. The initial burden rests on the moving party to point out the absence of any genuine issue of material fact. Once satisfied, the burden shifts to the opponent to demonstrate through production of probative evidence that there remains an issue of fact to be tried. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

On summary judgment, the inferences to be drawn from the underlying facts contained in the moving party's materials must be viewed in the light most favorable to the

party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Ybarra v. Reno Thunderbird Mobile Home Village*, 723 F.2d 675 (9th Cir.1984). This court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510. The trial court must therefore examine the facts to determine whether they are material, and assess the inferences which might reasonably be drawn from the facts.

## IV. LEGAL RULINGS OF GENERAL APPLICATION

### A. SECTION 18 OF THE EXCHANGE ACT

■ Section 18 claims have been stated against accounting defendants Arthur Andersen, Arthur Young and Touche Ross, and against the law firm of Jones Day. These claims have not been certified for class treatment. Defendants seek dismissal of these claims, arguing that proof of "eyeball reliance" cannot be demonstrated by the class. The weight of authority holds that plaintiffs must have actually read a copy of the misleading document to sustain a cause of action. *See In re M.D.C. Holdings Security Litigation*, 754 F.Supp. 785 (S.D.Cal.1990); *In re Genentech Inc., Securities Litigation*, [1989 transfer binder] Fed.Sec.L.Rep. (CCH) ¶ 94, 544, at 93,476 (N.D.Cal.1989); *Wachovia Bank & Trust Co. v. Natl. Student Mktg. Corp.*, 650 F.2d 342 (D.C.Cir.1980), *cert. denied*, 452 U.S. 954, 101 S.Ct. 3098, 3099, 69 L.Ed.2d 965 (1981); *Beebe v. Pacific Realty Trust*, 99 F.R.D. 60 (D.Ore.1983); *Ross v. A.H. Robins Co.*, 607 F.2d 545 (2d Cir.1979), *cert. denied*, 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802, *reh'g denied*, 448 U.S. 911, 100 S.Ct. 3057, 65 L.Ed.2d 1140 (1980).

■ In *Genentech, supra*, the court compared the reliance requirements of Sections 10(b) and 18, concluding that while Section 10(b) permits courts to redefine the reliance requirement to achieve its broad objectives, Congress imposed a specific reliance requirement in Section 18. *Genentech*, [1989 transfer binder] Fed.Sec.L.Rep. (CCH) ¶ 94, 544, at 93,480. "The reliance requirement in section 18(a). is not a judicial creation. It was imposed by Congress. As a result, courts may not dilute it ... even for arguably cogent reasons." *Id.* This court concludes that the requisite Section 18 reliance cannot be proven on a class basis. Accordingly, defendants' motions on the Section 18 counts are granted.

### B. AIDING AND ABETTING A BREACH OF FIDUCIARY DUTY

■ Corporate directors and officers owe a duty to the corporation and its shareholders to act in good faith, and with undivided loyalty. Cal.Corp.Code § 309(a). Such duties, however, are typically not owed to creditors, "for such a duty would seemingly turn every breach of contract action involving a corporation into a breach of fiduciary duty claim." *Gibraltar Fin. Corp. v. Fed. Home Loan Bank Bd.*, 1990 WL 394298, 1990 U.S.Dist. LEXIS 19,197 (C.D.Cal. June 14, 1990); *see also Kessler v. Gen. Cable Corp.*, 92 Cal.App.3d 531, 155 Cal.Rptr. 94 (2d Dist.1979).

■ Before *Roble* was removed to federal court, the Superior Court of California for the County of Los Angeles denied the *Roble* defendants' demurrer on the claim of aiding and abetting a breach of fiduciary duty. The Superior Court gave the debenture holders an opportunity to demonstrate extraordinary circumstances that would create a fiduciary duty, such as long standing reliance upon Lincoln Savings personnel for investment advice. *Roble v. Arthur Young*, Transcript of proceedings, at 23:19–24:13 (Cal.Super.Ct. April 24, 1990). The record cannot fairly be characterized as making this kind of showing with respect to the *Roble* class. Accordingly, defendants' motions for summary judgment on plaintiffs' claim for aiding and abetting a breach of fiduciary duty are granted.

### C. AIDING AND ABETTING NEGLIGENT MISREPRESENTATION

The *Roble* class alleges that the accountant, lawyer, and financial institution defen-

dants knew that ACC/Lincoln directors and officers were negligently misrepresenting ACC/Lincoln's true financial condition. Defendants contend that a claim for aiding and abetting negligence is not recognized by the courts.

■ At least one California court has sustained a cause of action for aiding and abetting a negligent misrepresentation. *In re ZZZZ Best Securities Litigation,* [1991 Transfer Binder] Fed.Sec.L.Rep. ¶ 95,416, at 97,075 (C.D.Cal.1990). This court recognizes, however, that other courts have found the concept of secondary liability for negligence to be inherently contradictory. *See Koehler v. Pulvers,* 606 F.Supp. 164, 173 n. 10 (S.D.Cal.1985) (law does not impose liability for conspiring to commit negligence); *Rogers v. Furlow,* 699 F.Supp. 672, 675 (N.D.Ill.1988) (claim of conspiracy to commit negligence is "paradox"). After a review of the available case law, this court adopts the latter view. Defendants' motions are therefore granted.

## D. SECTION 10(b)—STATUTE OF LIMITATIONS

At the time these lawsuits were filed, the statute of limitations for Section 10(b) actions was the state statute governing the limitations period for fraud. *Davis v. Birr, Wilson & Co., Inc.,* 839 F.2d 1369 (9th Cir.1988) (per curiam); *Volk v. D.A. Davidson & Co.,* 816 F.2d 1406 (9th Cir.1987); *Nesbit v. McNeil,* 896 F.2d 380 (9th Cir. 1990). Under both California and Arizona law, the statute of limitations for fraud is three years from the date plaintiffs should have discovered the existence of their claims. Under both California and Arizona law, plaintiffs' Section 10(b) claims were timely filed.

■ In June 1991, the United States Supreme Court altered the Section 10(b) statute of limitations, establishing a combination of a one-year period after discovery of the violation with a three-year period of repose. In addition, the Court ruled that the new limitations period would be applied retroactively to all pending litigation. *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* — U.S. —, 111 S.Ct.

2773, 115 L.Ed.2d 321 (1991); *James B. Beam Distilling Co. v. Georgia,* — U.S. —, 111 S.Ct. 2439, 115 L.Ed.2d 481 (1991). In response to the Supreme Court's decision, Congress enacted Section 476 of the Federal Deposit Insurance Corporation Improvement Act of 1991. This Act amended Section 27A of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa–1, effectively reestablishing the pre-*Lampf* limitations period for those cases pending on the date that *Lampf* was decided.

Section 27A provides:

SPECIAL PROVISION RELATING TO STATUTE OF LIMITATIONS ON PRIVATE CAUSES OF ACTION.

Section 27A(a) EFFECT ON PENDING CAUSES OF ACTION.—The limitation period for any private civil action implied under Section 10(b) of this Act that was commenced on or before June 19, 1991, shall be the limitation period provided by the laws applicable in the jurisdiction, including principles of retroactivity, as such laws existed on June 19, 1991.

15 U.S.C. § 78aa–1 (1992). Defendants challenge the constitutionality of Section 27A, arguing that Congress may not legislate a rule of decision in a particular case.

The Ninth Circuit addressed this issue in *Seattle Audubon Society v. Robertson,* 914 F.2d 1311 (9th Cir.1990), *cert. granted,* — U.S. —, 111 S.Ct. 2886, 115 L.Ed.2d 1051 (1991). In that case, the Ninth Circuit struck down a Congressional enactment which provided that a U.S. Forest Service plan for the endangered spotted owl was deemed to comply with the Endangered Species Act. However, whether the plan had been promulgated in accordance with the Endangered Species Act was an active controversy before a district court. The court held, "Congress violates the separation of powers when it presumes to dictate how the Court should decide an issue of fact (under threat of loss of jurisdiction)...." *Id.* at 1315 (quotations omitted). The court continued:

[T]he critical distinction, for purposes of deciding the limits to Congress' authority to affect pending litigation through statute, is between the actual repeal or

amendment of the law underlying the litigation, which is permissible, and the actual direction of a particular decision in a case, without repealing or amending the law underlying the litigation, which is not permissible.

*Id.* The Ninth Circuit concluded that the law at issue did "not establish new law, but direct[ed] the court to reach a specific result and make certain factual findings under existing law in connection with two cases pending in federal court." *Id.* at 1316.

In this instance, Section 27A repealed the statute of limitations underlying all Section 10(b) litigation. It does not apply exclusively to this controversy, nor does it legislate any particular outcome in the sense required by *Seattle Audubon.*

Defendants further contend that even if the constitutionality of Section 27A is conceded, the trend in the law as of June 19, 1991, was toward a *Lampf*-like statute of limitations. The Ninth Circuit, however, was not on the brink of joining this trend. As Justice O'Connor stated in her dissenting opinion, *Lampf* reversed a "solid wall of Ninth Circuit authority dating back more than 30 years." *Lampf,* 111 S.Ct. at 2785 (O'Connor, J., dissenting).

## V. RULINGS PERTINENT TO INDIVIDUAL DEFENDANTS

### A. STAR BANK

 Star Bank, a defendant only in *Roble,* moved for summary judgment on counts alleging fraud, negligent misrepresentation, breach of fiduciary duty, and violations of the California Corporations Code Sections 1507 and 25401. Summary judgment is granted on all counts because the record does not support reasonable inferences that are sufficient to sustain any of these claims. The key evidence upon which the court relies is summarized below:

(1) Plaintiffs contend Star Bank knew that Keating and his former partner, Cincinnati businessman Karl Lindner, had entered into an SEC consent decree in 1979. The only evidence plaintiffs bring forward concerning the consent decree is the testimony of one Star Bank employee, who remembered seeing something about it in the newspaper, but thought it had been resolved without an admission of guilt.

(2) Plaintiffs allege that knowledge of wrongdoing may be imputed from the fact that Lindner owned substantial stock in Star Bank's holding company. The record contains no evidence, however, that Lindner had any contemporaneous involvement with Keating, nor that he played any role in Star Bank's decision to serve as indenture trustee.

(3) Mark Sauter, ACC's in-house counsel, had previously worked at the law firm of Taft, Stettinius & Hollister from 1982 through 1987. Taft, Stettinius acts as Star Bank's counsel. The record contains no evidence, however, that anyone at Star Bank had any contact with Sauter, nor that Taft, Stettinius had any involvement in the decision to serve as indenture trustee.

(4) Plaintiffs contend that Star Bank had no procedures to govern its decision to serve as indenture trustee for ACC, which violated Comptroller of the Currency Regulations. Plaintiffs claim there was no meeting at which the decision to serve as indenture trustee for ACC was considered. This apparently is offered as indicative of Star Bank's willingness to disregard the rules in order to assist ACC. The evidence shows, however, that Star Bank's Trust Investment Committee reviewed and approved "new accounts activity reports," which specifically included the ACC debentures.

(5) Plaintiffs contend that Star Bank failed to do an independent credit analysis of ACC before agreeing to serve as indenture trustee, a departure from the procedure followed when Star Bank itself bought bonds. It was not until March, 1989, after intense negative publicity about ACC, that Star Bank decided to meet with ACC representatives about the company's financial situation. At that time, Star Bank considered having its own credit department review ACC's financial data, but this meeting never materialized because ACC's bankruptcy intervened.

Star Bank's duties are set forth in the Trust Indenture Act of 1939, 15 U.S.C. § 77*ooo*(a) (1939), which expressly permits an indenture trustee to rely on public documents provided by the offeror. In the absence of independent evidence that Star Bank knew or should have known of ACC's fraud, the bank's failure to perform a credit analysis earlier does not permit an inference against the bank.

(6) Plaintiffs allege that Star Bank participated in drafting the bond disclosure documents. The record shows, however, that it was Star Bank's practice as indenture trustee to become a member of a "working group," comprised of those involved in the issuance, and to whom draft disclosure documents were circulated. Star Bank reviewed the documents in accordance with their duties under the Trust Indenture Act. There is no evidence that Star Bank actually participated in drafting any documents material to the issues in this case.

(7) Plaintiffs contend Star Bank knew subordinated debentures were being sold through Lincoln Savings branches. The record shows that Star Bank personnel read the public prospectus, which stated that bonds were issued by ACC and sold out of Lincoln branches. Standing alone, however, this publicly available information cannot be viewed as conferring insight into the alleged fraud.

(8) Plaintiffs allege Star Bank knew of ACC's deteriorating financial condition yet did nothing to protect the bondholders. The record contains two items to support this contention. First, Star Bank's files contained a 1987 *Business Week* article critical of ACC. Second, in April 1988, Eugene Jacobs wrote a file memorandum explaining his recommendation that Star Bank serve as indenture trustee on a second series of bonds. Jacobs notes in this memorandum that ACC was highly leveraged, and engaged in above-average risk investments. Jacobs further states that on a visit to ACC he saw mock-ups of ACC's planned developments, which he considered likely to succeed due to the "delightful Phoenix weather," "population growth of 100,000 per year," and excellent staff at ACC. Read in conjunction with the other evidence in the record, these two facts are insufficient to charge Star Bank with knowledge of fraud at ACC.

(9) Plaintiffs allege that Star Bank acquired knowledge through meetings with ACC staff. There is evidence that Star Bank personnel met with ACC controller Lynn Borushko and Lincoln Savings Vice President Debra Millard–Schwartz. Neither have been named as defendants in these consolidated actions. There is uncontested testimony that the meetings concerned only the administrative details for processing the bonds. There is no evidence from which to infer conspiratorial intent.

(10) Plaintiffs contend Star Bank knew that ACC's independent accountants, Arthur Andersen and later Arthur Young, had resigned. The only evidence relevant to this contention is the fact that two Star Bank employees checked these names on their Deposition Questionnaires. These employees testified that at some time they had learned these firms had audited ACC/Lincoln. There is no evidence, however, of contemporaneous knowledge about disagreements between ACC and either accounting firm.

This court finds the evidence before it is insufficient to sustain a reasonable inference that Star Bank knew of or intended to further a fraud. Nor is there a showing that Star Bank breached its duties as indenture trustee, or made negligent misrepresentations to the bondholders. Accordingly, Star Bank's Motion for Summary Judgment is granted.

## B. TOUCHE ROSS & COMPANY

Touche is a defendant in *Shields, Roble,* and *Yahr.* Claims against Touche include Section 10(b), RICO, AZRAC, fraud and misrepresentation, and violations of the California Corporations Code. In addition, the *Yahr* plaintiffs allege negligent misrepresentation and professional negligence.

Touche became involved with ACC/Lincoln toward the end of its business existence in October, 1988. Touche argues it did not complete an audit, and had no duty

to disclose information until the audit was completed and a report issued. Touche contends it was not named in a registration statement or prospectus, and gave no public opinions with respect to ACC/Lincoln for which it could be held liable. Touche further argues that plaintiffs did not rely on its statements, and could not have relied indirectly, as Touche made no representations in any offering documents. Finally, Touche contends there is no evidence that its conduct affected regulatory decision-making.

Plaintiffs, on the other hand, argue that by accepting the ACC/Lincoln engagement, and by continuing to work for ACC/Lincoln, Touche permitted the additional sale of millions of dollars in bonds. Plaintiffs contend that the evidence raises genuine questions as to whether Touche took and retained the engagement with knowledge of or in reckless disregard of the alleged fraud by ACC/Lincoln.

The United States Supreme Court has discussed the duties of an independent public accountant:

> Corporate financial statements are one of the primary sources of information available to guide the decisions of the investing public. In an effort to control the accuracy of the financial data available to investors in the securities markets, various provisions of the federal securities laws require publicly held corporations to file their financial statements with the Securities and Exchange Commission. Commission regulations stipulate that these financial reports must be audited by an independent certified public accountant in accordance with generally accepted auditing standards. By examining the corporation's books and records, the independent auditor determines whether the financial reports of the corporation have been prepared in accordance with generally accepted accounting principles. The auditor then issues an opinion as to whether the financial statements, taken as a whole, fairly present the financial position and operations of the corporation for the relevant period.

*United States v. Arthur Young & Co.,* 465 U.S. 805, 810–811, 104 S.Ct. 1495, 1499–500, 79 L.Ed.2d 826 (1984). Plaintiffs view such statements of an auditor's responsibilities as affirmations of the accountant's duty to the public. Touche argues that its duties are limited to the completion of the audit it was hired to perform.

An accountant is not obligated to disclose ordinary business information. *Rudolph v. Arthur Andersen & Co.,* 800 F.2d 1040 (11th Cir.1986), *cert. denied,* 480 U.S. 946, 107 S.Ct. 1604, 94 L.Ed.2d 790 (1987). Knowledge of an ongoing fraud is a different matter entirely:

> The situation is quite different, however, where the issue is disclosure of actual knowledge of fraud. Standing by while knowing one's good name is being used to perpetrate a fraud is inherently misleading. An investor might reasonably assume that an accounting firm would not permit inclusion of an audit report it prepared in a placement memo for an offering the firm knew to be fraudulent, and that such a firm would let it be known if it discovered to be fraudulent an offering with which it was associated. It is not unreasonable to expect an accountant, who stands in a "special relationship of trust vis-a-vis the public" (citation omitted) and whose duty is to safeguard the public interest, (citation omitted) to disclose fraud in this type of circumstance, where the accountant's information is obviously superior to that of the investor, the cost to the accountant of revealing the information is minimal, and the cost to the investors of the information remaining secret potentially enormous.

*Id.*

This court holds that an independent public accountant who knows of or recklessly disregards a client's fraud, may be held liable for aiding and abetting that fraud where the auditor provides services which constitute substantial assistance. Whether an audit has been completed is not necessarily determinative of whether the assistance is "substantial." If an auditor is aware that an ongoing fraud is a real possi-

bility, he or she may not act as an advocate for its wrongdoing client. Nor may the auditor stand by, knowing of a fraud, and withhold damaging information from the SEC and federal bank regulators. Nondisclosure under these circumstances may constitute substantial assistance because regulators and the public are entitled to assume that an independent public accountant would take steps—either through frank discussions with regulators, the issuance of a preliminary cautionary report, or withdrawal from the account—if the auditor is aware that its client is perpetrating an ongoing fraud. Finally, an auditor may not enjoy the pecuniary benefits of an engagement, while protecting itself by postponing the issuance of an audit opinion, or making highly qualified representations to the public or regulators.

 On the other hand, the court holds that an auditor may not be held liable merely for accepting an engagement unless the auditor actually knows its prospective client is committing a fraud, and provides services which substantially assist the execution of the fraud.

 In addition, an auditor may not be held liable under the securities laws for innocently or negligently failing to discover a fraud sooner than it did. The line may be difficult to discern. Based on the record, the court cannot determine, as a matter of law, that Touche's conduct was innocent or negligent.

When viewed in the light most favorable to the nonmovants, the evidence regarding Touche's acceptance of the ACC/Lincoln engagement and its ongoing services raises genuine questions concerning (1) whether Touche knew of the fraud and tacitly agreed to provide assistance in exchange for fees, and/or (2) whether Touche's conduct was such an extreme departure from the standards of ordinary care as to present a danger of misleading buyers that was either known to Touche, or so obvious that Touche must have been aware of it, and (3) whether Touche provided "substantial assistance" by agreeing to serve as auditor, advocating for its client, and by withholding material information from reg-

ulators which may have been a factor in permitting the fraud to continue. *Hollinger, supra.*

The record contains the following evidence:

On October 13, 1988, Keating offered the ACC engagement to the Phoenix office of Coopers Lybrand, which previously had been hired for the limited purpose of reviewing a transaction involving General Oriental Investments Limited ("GOIL"). Coopers Lybrand responded that they would immediately put GOIL on hold, until the completion of its client acceptance procedures, a process which would take two to three weeks. GOIL was a pivotal transaction on which ACC proposed to book significant gain. Only days earlier, ACC's prior auditor, Arthur Young, had refused to book gain on the GOIL transaction, precipitating its withdrawal from the ACC account.

In early October 1988, Touche's Phoenix office learned that ACC and Arthur Young would part company, and on October 17, 1988, Touche delivered an unsolicited bid of $1.075 million for the ACC audit engagement. Over the next several days, private meetings were held between Jerry Mayer, head of Touche's Phoenix office, Jack Atchison, and Keating, which resulted, on October 25, 1988, in Touche preparing an engagement letter for ACC.

The events surrounding Touche's retention of ACC as a client are summarized in two lengthy file memoranda written by Touche partners Jerry Mayer and Fred Martin.

On October 19, Mayer had lunch with Jack Atchison, who had been at ACC for over six months, after having left his post as Arthur Young engagement partner for the ACC account. At the time this court rendered its summary judgment decisions, Atchison, a defendant in these proceedings, had asserted his Fifth Amendment privilege. According to Mayer's November 7th file memo, Atchison was impressed with the Touche proposal, but stated that "ACC was pretty far down the road with Coopers Lybrand." Mayer's memo states that At-

chison "several times mentioned the reason for the ACC–Arthur Young disagreement, but that Atchison blamed it totally on the relationship of Arthur Young's new lead partner and members of ACC and not on any particular accounting issues in which AY and the company had disagreements." Mayer comments, "it was obvious that these disagreements did bring sharp focus to the relationship process." At his deposition, Mayer had no independent recall of the topics discussed with Atchison. Kevin O'Connell of the Federal Home Loan Bank Board ("FHLBB") testified Mayer had told him that Atchison was "feeling out firms." O'Connell Deposition, 9–25–90 at 261.

On the evening of October 19, Mayer called Keating. Mayer, Keating, and Charles Keating III later met privately at the Phoenician Hotel for approximately 45 minutes. Although Touche partners Dave Martin and Fred Martin accompanied Mayer to the hotel, they did not attend the meeting. At his deposition, Mayer could not recall "what the strategy was." In his November 7 file memo, Mayer wrote that Keating told him he had intended to say ACC was pretty far along with Coopers, but that at the end of his discussions with Mayer, "he was not comfortable with that conclusion any more."

Kevin O'Connell testified Mayer told him that during a private meeting, Keating "had presented hypothetical accounting situations to him" and Mayer had professed they would "keep an open mind." *See* O'Connell deposition.[2]

On or about October 20th, Touche asked the chief executive officer of their client, M.D.C. Holdings, Inc. ("M.D.C."), to call Keating on their behalf. At the time, M.D.C. was under SEC investigation. Touche was aware of transactions between ACC and M.D.C. Touche partner Thomas Bintinger testified that Touche had audited real estate transactions between ACC and M.D.C., but could not recall their conclusions. He testified that in the fall of 1988, Touche had concerns about the integrity of M.D.C. management.

On October 21, Mayer wrote to Judy Wischer, reassuring her that the selection of Touche as auditor could be handled in a noncontroversial way. Mayer suggested that Touche Chairman Ed Kangas meet with FHLBB Chairman Danny Wall, if necessary, to explain that Touche's selection was the result of its unsolicited proposal, rather than "a request by ACC following any reaction by Coopers Lybrand." Also on October 21, Douglas McEachern of Touche's Los Angeles office and a former FHLBB fellow, reassured Keating that he would be "a team player," who would discuss issues with regulators on ACC's behalf, and that he was not negatively predisposed to ACC—an impression Keating apparently had formed. McEachern testified that he was not concerned with management integrity at ACC because Darrell Dochow, Executive Director of the FHLBB Office of Regulatory Policy, Oversight, and Supervision had told him that ACC's directors were "honorable people." Dochow testified, however, that he did not recall making that statement, "especially during that time period."

On October 24, Keating offered the ACC engagement to Touche. Mayer testified that it was during this conversation that Keating said he wanted to discuss a transaction. Prior to this phone call, Mayer testified, although he knew that Coopers Lybrand had been auditing a transaction,

---

2. FHLBB's Carol Larson wrote a file memorandum summarizing Touche's responses to questions about opinion shopping:

 According to TR, Lincoln offered the engagement to TR prior to any meaningful discussion of the GOIL transaction taking place. O'Connell testified that this was Larson's attempt to summarize what they thought had been said:

 Touche recall[ed] some general discussions about the possible transaction but did no substantive work until after they were engaged.

 [T]hey were kind of vague about it, [they said] some hypothetical situation was proposed to them by, I believe it was Keating actually. And they expressed an open mind as to how the accounting treatment for that hypothetical situation would be treated.

 O'Connell Depo. at 277 (Sept. 25, 1990). O'Connell understood this conversation to have taken place during the private meeting between Mayer and Keating at the Phoenician Hotel.

he did not know which transaction it was. That same afternoon, Keating and Mayer met privately for a few minutes before a larger meeting with Fred Martin, Judy Wischer and Andrew Ligget. Mayer could not recall what was discussed at this private meeting. At the larger meeting, ACC explained GOIL and gave Martin and Mayer reports written by Lexecon and Professor Sidney Davidson. On the evening of October 24, Mayer and Martin called Robert Kay, Touche senior national technical partner, at his home to explain the GOIL transaction. They sent the Lexecon and Davidson reports to Kay by overnight mail.

On October 25, Mayer advised Keating that Touche found support in the accounting literature for ACC's position that profit should be booked on GOIL. That same day, Touche prepared an engagement letter, to examine all consolidated and separate subsidiaries' financials for the year ending December 1988. The $1.075 million audit bid was gone; the letter contained no estimated audit fee. Fred Martin testified that Keating had released Mayer from the earlier bid some time after the meeting on the evening of October 24 and before the engagement letter was prepared on October 25, although Martin was not present during the conversation. Jerry Mayer, however, could not recall why the audit fee changed, nor could he recall any discussions about audit fees.

On October 26, Mayer and Keating met privately to discuss the basis for Touche's GOIL opinion. Mayer advised Keating that because the opinion would be disputed by the SEC, he recommended that ACC obtain an SEC opinion. Also on October 26, Keating signed the Touche engagement letter, subject to Touche meeting with Arthur Young, as required by the audit rules. On or about October 26, Keating informed Coopers Lybrand that they would not receive the engagement because "the chemistry was better with Touche Ross."

On November 1, 1988, Mayer, Fred Martin and Kay met with auditors from Arthur Young. Arthur Young testified that they withheld nothing. Touche, however, disputes that Arthur Young told them any-thing which raised concerns about management integrity. The record reflects extensive discussion among the accountants. For example, Arthur Young partner Kenneth Kroese took notes of the meeting, which state in part:

> Touche asked about management credibility problems and Janice [Vincent] said she believed that the question they were asking was about facts which might bear on the integrity of management. Those facts might be that we believed their accounting was aggressive, that they had several transactions with follow on transactions and that they had many transactions with the same parties. Bob Kay asked what that had to do with management credibility, and Janice repeated that she felt that those were facts that could bear on management integrity. Bob Kay asked then whether we would say our firm had not concluded that we had a management credibility problem. Janice said yes (we had not concluded).

On the same day, Touche accepted the engagement.

The evidence reflects that Touche was aware of ACC's sale of subordinated debentures. On November 1, ACC issued a prospectus for an additional $300 million debt offering. At about this time, *Forbes* magazine published an article about ACC entitled "Trust Me," which was critical of Keating and described ACC's voluminous sales of debentures. The article was produced from Touche's files. When asked whether he was aware of the debenture sales, Mayer testified that he had a "vague recall" about subordinated debentures during this time. Martin testified that, on occasion, he looked into whether ACC could sell debt without the assistance of an independent auditor, but could not recall when or why he had done so.

On November 8, Mayer and Martin wrote their lengthy and arguably self-conscious memoranda for their files, explaining the chronology of Touche's retention and discussions of the GOIL transaction. At deposition, Mayer's recollection of the events at issue was sketchy.

On November 14, 1988, ACC filed a form 8K with the SEC, accompanied by Touche's letter agreeing with statements contained therein. The form 8K stated:

On November 1, 1988, the registrant engaged Touche Ross as independent accountants to audit registrant's financial statements. Registrant offered the engagement to Touche Ross on October 24, 1988. Subsequent thereto and prior to accepting the engagement, in accordance with professional standards, Touche Ross discussed with the registrant and its former accountants matters relating to the engagement including the matter of disagreement concerning the non-monetary exchange of assets in September, 1988 (described in the registrant's form 8K filed with the SEC on October 28, 1988). During the course of completing its procedures, Touche Ross expressed its preliminary view that the accounting literature appeared to support the registrant's analysis of the transaction. Touche Ross accepted the engagement on November 1, 1988.

In a letter to SEC's chief accountant, Touche stated that ACC's accounting treatment of GOIL was supported by accounting literature. On November 18, Touche and ACC met with the SEC to discuss GOIL. The SEC rejected ACC's proposed profit recognition on the GOIL transaction, and a press release was issued. On November 21, 1988, ACC filed a third quarter 10Q with the SEC. Touche's name does not appear in the 10Q. The document provides that although GOIL profit "is not recognized this quarter, the company expects that it will be in the future."

On December 12, 1988, Touche met with FHLBB's Kevin O'Connell and Carol Larson at the Dallas airport. The FHLBB arranged the meeting because of its concern that Touche's retention was the result of opinion shopping on the GOIL issue. FHLBB records reflect that Touche assured the regulators there was no "meaningful" discussion of GOIL until two days after the engagement. *See* note 2, *supra.* Based on these representations, FHLBB consented to Touche's retention as auditor for Lincoln. Nevertheless, Larson informed her superiors that she was "dismayed by Touche Ross' answers to questions concerning GOIL because they show no independent investigation by Touche Ross. They were just accepting Lincoln's answers."

On December 20, 1988, FHLBB sent Touche the results of its 1988 examination of ACC. The findings included:

Management repeatedly engaged in material violations of law and regulations regarding affiliated transactions, ESOP, Hotel Pontchartrain, and tax sharing agreement;

ACC is operating Lincoln solely for its own benefit;

Lincoln is severely undercapitalized;

Regulators have great concerns about Lincoln's continued viability;

Lincoln due over $50 million in tax payments upstreamed to ACC.

When questioned about the report, Mayer later testified that he recalled little about the FHLBB examination findings, and that the report raised no concerns in his mind concerning management integrity. Mayer testified that he did not know, even upon reading the report at his deposition, if it was "critical of management." Fred Martin testified that his first concerns about ACC's management integrity did not develop until March 1989.

Touche was engaged in December, 1988, to perform due diligence of Lincoln's assets for Spencer Scott Group, a prospective buyer of Lincoln. Touche ultimately disassociated itself from the proposed plan of sale. Information from this due diligence team was fully available to the ACC audit team.

On December 22, the California Department of Savings and Loan issued a cease and desist order, prohibiting illegal loans.

On December 28, 1988, Touche wrote to Darrell Dochow in response to the December 20 exam findings. Touche stated "we assume (though we do not necessarily concur) that the FHLBB's substantive conclusions are correct." Touche professed that it could only address substantive issues upon completion of the audit, and took issue with certain "calculation errors". On

January 3 and 30, 1989, ACC filed prospectus supplements for $50 million in additional bonds.

On January 31, 1989, Darrell Dochow, by letter to Touche, requested elaboration on statements in the December 28 letter concerning reversals of income on the Crescent and Phoenician Hotels, and raised issues as to capitalized interest, capital requirements, proper accounting for a land development called Rancho Vistoso, and recovery of lost reserves. FHLBB requested the information within ten days. On February 8, 1989, Touche informed the FHLBB that they had just received the letter and could not comply within the time frame. On February 28, FHLBB's Alvin Smuzynski noted that Touche's answer had not arrived. In an E-mail to his colleagues, Smuzynski stated, "I get the impression Touche is ducking for cover now."

Fred Martin testified that he first thought about "going concern" issues and discussed the possibility of qualifying Touche's audit opinion with Keating during March 1989. He said Keating seemed to understand, and said he would get him the necessary information to avoid a qualification, but never did. Martin testified that he had his first concerns about management integrity in March 1989, when he learned about the criminal referral and about certain real estate transactions. Touche's Robert Kay testified that he never had concerns about management integrity.

On March 23, 1989, Touche wrote to the FHLBB regarding the proper accounting treatment for the sale of Lincoln Savings. This was followed by a one-hour phone meeting with Touche, ACC, and FHLBB. FHLBB's Larson subsequently summarized the letter and meeting for Darrell Dochow. She wrote, "Touche Ross refused to make a concise comment regarding the value of the hotels and the stock. They just repeated several times that they were not far enough into the audit to determine that yet." Larson concluded, "I do not believe Touche Ross was being totally honest with us regarding the status of the audit. They have to file *something* with

the SEC by mid-April ... they *must* be closer to reaching conclusions than they were willing to admit." On March 28, Larson wrote to Dochow, stating, "I agree with your sentiment regarding holding Touche to the standard audit report deadline. They have been less than forthright in their dealings with us to date and I would like to return the favor."

On April 1, 1989, Keating wrote, and Touche accepted, a check for $2.2 million for services in anticipation of bankruptcy. On April 13, 1989, ACC filed its Chapter 11 petition. One day later, FHLBB imposed a conservatorship on ACC. On April 14, 1989, Mayer sent an intra-office memorandum to Touche's Phoenix staff, instructing, "Your *only* proper response [to questions about ACC] is that you are unfamiliar with ACC's situation. Refer them to Martin or me if they have further questions." (Emphasis in original.) On April 21, 1989, Carol Larson E-mailed to a colleague, "We have had *quite* a time with Touche Ross and I just wanted to chat with you about them before you have to start dealing with them."

Based on this and other evidence in the record, the court finds summary judgment inappropriate. The court finds that the following evidence, in particular, bears on the element of reckless scienter: credibility of certain testimony on opinion shopping and other issues, knowledge potentially acquired from Keating, Wischer or Atchison, familiarity with public skepticism about ACC, information exchanged at the meeting with Arthur Young, knowledge of M.D.C. transactions with ACC and of management integrity issues with respect to M.D.C., knowledge that ACC was selling subordinated debentures without an underwriter, involvement with SEC and 8K filings, knowledge acquired through due diligence for Spencer Scott Group, knowledge of the December FHLBB examination report, inferences that could be drawn from FHLBB reports about Touche's dealings with them, and inferences from evidence concerning fees. Accordingly, based on the disputed facts above, Touche's Motion for Summary Judgment is denied.

## C. LEXECON INC.

Lexecon contends that plaintiffs' claims are based on reports submitted to regulators and must fail as the reports are protected by the First Amendment and the *Noerr–Pennington* doctrine.

### 1. *First Amendment*

██ The First Amendment does not shield fraud or misrepresentation. *See Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990); *Unelko Corp. v. Rooney,* 912 F.2d 1049 (9th Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 1586, 113 L.Ed.2d 650 (1991). "There is no constitutional value in false statements of fact." *Milkovich,* 497 U.S. at 12, 110 S.Ct. at 2705 (quoting *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 339–40, 94 S.Ct. 2997, 3006–07, 41 L.Ed.2d 789 (1974)).

### 2. *The Noerr–Pennington Doctrine*

██ The *Noerr–Pennington* doctrine derives from anti-trust law. Although restraints in trade are prohibited in the private sector, they are under some circumstances permissible forms of government regulation. The doctrine was created to protect those who would use the regulatory process in good faith to obtain government action with respect to competition. *See Eastern R.R. Presidents Conf. v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 140, 81 S.Ct. 523, 531, 5 L.Ed.2d 464 (1961).

██ *Noerr–Pennington* does not, however, protect those who use the legislative or judicial process as an anti-competitive weapon, with no expectation of obtaining legitimate government action. *City of Columbia v. Omni Outdoor Advertising Co., Inc.,* — U.S. —, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991); *Oregon Nat. Res. Council v. Mohla,* 944 F.2d 531 (1991). *Omni,* 111 S.Ct. at 1353–54. For example, in *Mohla,* a timber company charged that a lawsuit filed by a public interest group created an impermissible interference with its right to contract. The Ninth Circuit held that the lawsuit was not a nuisance filed solely to interfere with Mohla's business. Rather, it was filed for the legit-imate purpose of obtaining government action. The Council's conduct was therefore protected by *Noerr–Pennington.*

██ The allegations against Lexecon are a different matter. It is alleged that Lexecon knowingly made misrepresentations to federal regulators on matters within its expertise. *Noerr–Pennington* simply has no application here. It does not protect all communications with government. The federal securities laws, for example, are predicated upon openness and truthfulness in the sale of securities. Similarly, regulation of the nation's financial institutions are predicated at least in part upon the integrity of professionals who issue opinions with respect to those institutions. A rule of law which excused misrepresentations when it is the truth of the information which is fundamentally at issue would undermine the fabric of both systems. Whatever the ultimate breadth of *Noerr–Pennington,* it is not a shield for fraud.

### 3. *Aiding and Abetting*

██ Lexecon issued several reports over the course of its work for ACC/Lincoln. Each rebutted regulatory criticism on material issues. In reports concerning the valuation of the Phoenician and Crescent Hotels, alleged to have been Lincoln's largest assets, Lexecon was highly critical of the appraisal methodology and conclusions of the regulators' consultants. The values reached by Lexecon allegedly assisted in preventing write-downs on Lincoln's books. In 1987, Lexecon agreed to rebut the Federal Home Loan Bank of San Francisco's ("FHLB-SF") 1986 examination report and to participate in litigation, if it became necessary. Lexecon reported on two key issues—Lincoln's net worth and its high yield bond portfolio. Lexecon stated, "Lincoln is sound," "safer than comparable thrifts," and "safer than when acquired." Lexecon contends that these reports are not false or misleading when viewed as a whole. The court concludes, however, that the record raises material issues as to each.

Moreover, the evidence raises material questions as to whether Lexecon possessed reckless scienter. In May 1987, Lincoln transmitted to Lexecon the prospectuses for three series of securities, as well as other financial information. A copy of an April 18, 1985 prospectus was contained in Lexecon's files. Lexecon's Robert Sherwin testified that he was aware of debenture sales in the spring of 1987, that he reviewed prospectuses, and that he read the *Forbes* "Trust Me" article, which made him wonder what was going on. Moreover, Lexecon reviewed with ACC's attorneys, the FHLB–SF exam report, which sets forth extensive regulatory violations.

Lexecon knew of Ivan Boesky's plea of guilty to insider trading violations, and of FHLB–SF's concerns about ACC/Lincoln's holdings in the Boesky high yield fund. Lexecon had computer tapes of ACC's high yield bond investment transactions, but denies analyzing or relying on them in reaching its conclusions. Lexecon personnel testified that no alternative analysis of Lincoln's high yield investments was performed upon learning that these investments were not sufficiently traded to permit analysis using public information. Nevertheless, the Lexecon reports arguably did not make clear that the opinions proffered had been formed without reference to the actual facts.

The following evidence raises questions as to whether Lexecon provided substantial assistance. First, ACC arguably benefitted from Lexecon's prominent reputation. Lexecon's reports went to regulators and others at key junctures, and arguably gave Lincoln badly needed support and credibility at important times. Second, the record indicates that the regulators' decision to execute a Memorandum of Understanding, moving regulatory supervision of Lincoln to Washington, D.C. rather than impose a conservatorship, was influenced by the fact that Lincoln's experts avowed it was safe, and that the litigation threatened by Keating in the event of a conservatorship would be a "battle of the experts." The Lexecon

reports, if in fact they contained misrepresentations, may have made it more difficult for the regulators to justify a conservatorship under the thrift laws, whether or not the regulators themselves believed the opinions to be correct. And finally, the evidence indicates that Touche relied on the GOIL report in making its overnight decision to comment favorably on ACC/Lincoln's position with respect to GOIL.[3]

The court concludes that, taken as a whole, the record raises material questions concerning Lexecon's knowledge and intent to aid and abet a course of conduct, violative of Section 10(b), RICO, AZRAC, and common law fraud.

 The court grants summary judgment on claims based on Cal.Corp.Code §§ 1507 and 25401. Section 1507 applies only to "officers, directors, employees or agents of a corporation." Because Lexecon was a consultant rather than a director, officer, employee, or agent of ACC/Lincoln, § 1507 does not apply. Moreover, Section 25401 makes it unlawful for any person to offer or sell a security by means of a misleading written or oral communication. Section 25401 is narrower in scope than Section 10(b), which proscribes schemes to defraud and courses of business that operate to deceive, in addition to direct misrepresentations about securities. Lexecon's alleged conduct is more in the nature of aiding and abetting an overall scheme to defraud, rather than providing material assistance in specific misleading oral or written communications used to sell the securities.

## D. JONES, DAY, REAVIS & POGUE

Jones Day, a defendant in *Shields, Roble, RTC v. Keating,* and *Yahr,* focuses its summary judgment motion on an individual opinion letter given in connection with a 1986 registration statement. Jones Day claims this opinion letter was neither false, nor was it written in an expert capacity. Jones Day generally claims that it has not

---

**3.** There are questions of fact about whether Professor Sidney Davidson's report was attribut-

able to Lexecon.

engaged in conduct for which it could be held liable because lawyers are obligated to keep their clients' confidence and to act in a ways that do not discourage their clients from undergoing regulatory compliance reviews.

### 1. *The Record*

The record reveals the following facts concerning Jones Day's involvement with ACC and Keating.

Prior to joining Jones Day, defendant William Schilling was director of the FHLBB Office of Examinations and Supervision. In that capacity, he was directly involved in the supervision of Lincoln Savings. During the summer of 1985, he wrote at least one memorandum and concurred in another, expressing serious regulatory concerns about numerous aspects of Lincoln's operations. For example, he wrote:

> [U]nder new management, Lincoln has engaged in several serious regulatory violations. Some of these violations, such as the overvaluation of real estate and failure to comply with Memorandum R–41(b), are the same type of violations that have lead to some of the worst failures in FSLIC's history.

Later in 1985, Schilling was hired by Jones Day to augment its expertise in thrift representation. On January 31, 1986, Schilling and Jones Day's Ron Kneipper flew to Phoenix to solicit ACC's business. ACC retained Jones Day to perform "a major internal audit of Lincoln's FHLBB compliance and a major project to help Lincoln deal with the FHLBB's direct investment regulations."

During the regulatory compliance audit, which Jones Day understood to be a pre-FHLBB examination compliance review, the law firm found multiple regulatory violations. There is evidence that Jones Day knew that Lincoln had backdated files, destroyed appraisals, removed appraisals from files, told appraisers not to issue written reports when their oral valuations were too low, and violated affiliated transaction regulations. Jones Day found that Lincoln did no loan underwriting and no post-clo-

sure loan followup to ensure that Lincoln's interests were being protected. Jones Day learned Lincoln had multiple "loans" which were, in fact, joint ventures which violated FHLBB regulations, made real estate loans in violation of regulations, and backdated corporate resolutions which were not signed by corporate officers and did not reflect actual meetings. There is evidence that Jones Day may have tacitly consented to removal of harmful documents from Lincoln files. For example, one handwritten notation on a memorandum memorializing Jones Day's advice not to remove documents from files reads, "If something *is* devastating, consider it individually." (Emphasis in original).

There is evidence that Jones Day instructed ACC in how to rectify deficiencies so that they would not be apparent to FHLBB examiners. Jones Day attorneys, including Schilling, testified that they told ACC/Lincoln personnel to provide the Jones Day-generated "to do" lists only to the attorneys responsible for rectifying the deficiencies, and to destroy the lists so that FHLB–SF would not find them in the files. For the same reason, Jones Day's regulatory compliance reports to ACC/Lincoln were oral. Jones Day paralegals testified that responsibilities for carrying out the "to do" lists were divided among Jones Day and ACC staff. Jones Day continued this work into the summer of 1986.

The evidence indicates that Jones Day may have been aware that ACC/Lincoln did not follow its compliance advice with respect to ongoing activities. There are material questions of fact concerning the procedures Jones Day used—if any—to ascertain whether their compliance advice was being heeded. The testimony suggests that Jones Day partners knew ACC/Lincoln personnel were preparing loan underwriting summaries contemporaneously with Jones Day's regulatory compliance review, even though the loan transactions had already been closed. Moreover, the evidence reveals that Jones Day attorneys participated in creating corporate resolutions to ratify forged and backdated corporate records.

On April 23, 1986, Jones Day partner Fohrman wrote:

I received Neal Millard's memo on ACC. In looking at the long list of people involved, it occurred to me that there will be times when individuals may be called upon to render legal services that might require the issuance of opinion letters from Jones, Day. As we all know, we now possess information that could affect the way we write our opinion letters and our actual ability to give a particular opinion may be severely restricted. However, this large list of individuals may not be aware of knowledge that is held by Messrs. Fein and Schilling. I would suggest that a follow up memo be issued by Ron Fein indicating that any work involving ACC which requires the issuance of opinions, must be cleared by Ron....

Also in April 1986, ACC's Jim Grogan wrote to Jones Day's Kneipper, soliciting a strategy to "sunset" the FHLBB direct investment regulation. Jones Day subsequently made multiple Freedom of Information Act requests to FHLBB in furtherance of a direct investment rule strategy, for which Lincoln was billed. In a September 12, 1986 telephone conversation, Grogan allegedly told Kneipper: "[C]omment letters were great success—FHLBB picked it up 'hook, line and sinker' ... Charlie wants to do again...."

The record indicates that the concept of selling ACC debentures in Lincoln Savings branches may have originated at an April 9, 1986 real estate syndicate seminar given by Jones Day Defendant Ron Fein. There is evidence that Fein may have contributed to the detailed bond sales program outline, attending to details such as explaining how the sales would work, and insuring that the marketing table was far enough from the teller windows to distinguish between ACC and Lincoln Savings employees. The evidence indicates that Jones Day reviewed the debenture registration statement and prospectus, which is corroborated by Jones Day's billing records. As a result, in January 1987, ACC was able to assure the California Department of Savings & Loan that:

The process of structuring the bond sales program was reviewed by Kaye, Scholer and Jones Day to assure compliance not only with securities laws and regulations, but also with banking and FSLIC laws and regulations.

Moreover, there is evidence which suggests that political contributions were made on behalf of ACC, in exchange for ACC's consent that Jones Day could "bill liberally." On June 23, 1986, Kneipper memorialized a phone conversation:

(1) 1:15 p.m. Ron Kessler—in past, firm has given $ amt. to PAC, has premium billed, & PAC contri. to candidate; concern that we're an out of state law firm and that a $# in excess of $5,000.00 would look like an unusual move; Barnett and Kessler have done before; question re whether and how we can get some busi. from GOV. for this.

(2) 3:40 p.m. Jim Grogan

Ten tickets at $1,000.00 equals $10,000.00

Barr wants limits of $5,000.00/contribution

Agreed that we could bill liberally in future in recognition of this.

At deposition, Kneipper testified that his note—"agreed could bill liberally in recognition for this,"—"is what it appears to be." Jones Day set up an Arizona Political Action Committee ("PAC") specifically for the purpose of making a contribution to an Arizona gubernatorial candidate. The PAC was opened on September 4, 1986 and closed in December, 1986, after the contribution was made.

In June 1986, Jones Day solicited additional work from ACC. Jones Day attorney Caulkins wrote, in part:

Rick Kneipper reports that ACC is very explicit that it does not care how much its legal services cost, as long as it gets the best. He states that Keating gave him an unsolicited $250,000 retainer to start the thrift work, and sent another similar check also unsolicited in two weeks. On the down side, he reports that he has never encountered a more demanding and difficult client, ...

It appears to Rick and to me that American Continental is made for us and we for them.

On October 28, 1986, Jones Day provided an opinion letter, required by Item 601(b) of SEC regulation S–K, for inclusion in an ACC bond registration statement. Jones Day's opinion letter stated that the indenture was a valid and binding obligation under California law.

### 2. Section 10(b), RICO, and Common Law Fraud

Jones Day seeks summary judgment on Plaintiffs' claims under Section 10(b), RICO and common law fraud.

 Jones Day contends that it may not be held liable for counseling its client. The line between maintaining a client's confidence and violating the securities law is brighter than Jones Day suggests, however. Attorneys must inform a client in a clear and direct manner when its conduct violates the law. If the client continues the objectionable activity, the lawyer must withdraw "if the representation will result in violation of the rules of professional conduct or other law." Ethical Rule 1.16 ("ER"). Under such circumstances, an attorney's ethical responsibilities do not conflict with the securities laws. An attorney may not continue to provide services to corporate clients when the attorney knows the client is engaged in a course of conduct designed to deceive others, and where it is obvious that the attorney's compliant legal services may be a substantial factor in permitting the deceit to continue. *See Rudolph v. Arthur Andersen, supra.*

The record raises material questions about whether Jones Day knew of ACC/Lincoln's fraud, but nevertheless provided hands-on assistance in hiding loan file deficiencies from the regulators, offered detailed advice about setting up the bond sales program, carried out a lobbying strat-

egy with respect to the direct investment rule, made political contributions on ACC's behalf, reviewed SEC registration statements and prospectuses, and lent its name to a misleading legal opinion. This evidence raises material questions concerning Section 10(b), RICO, AZRAC, common law fraud and deceit, and violations of Cal. Corp.Code §§ 25401 and 25504.1.

### 3. Section 11 Liability

Section 11 imposes liability for misleading statements made in connection with registration statements. Jones Day offers two arguments.

#### a. Statute of Limitations

 Actions under Section 11 must be brought within one year from inquiry notice, with a repose of three years. 15 U.S.C. § 77m. The shelf registration containing Jones Day's opinion became effective on November 12, 1986, and the sale of bonds subsequently began on December 2, 1986. Item 512(a)(2) of Regulation S–K provides that a post-effective date amendment to a registration statement is deemed a new registration statement for purposes of Section 11 liability. This court concludes that securities offered by post-effective date amendments are deemed initial bona fide offerings, triggering new limitations periods.

 ACC filed post-effective date amendments to the shelf registration in March 1987, May 1987, and April 1988.[4] Thus, the three-year limitations period ended (by respective offerings) in December 1989, March 1990, May 1990, and April 1991. Therefore, only actions based on the first offering are potentially barred. The court holds, however, that because Jones Day knew that it was a potential defendant at least as early as November 1989, these claims may proceed.[5]

---

4. The registration was withdrawn in August 1988.

5. The record contains evidence that in November 1989, counsel for Jones Day approached counsel for class plaintiffs, requesting that they defer naming Jones Day as a defendant until Plaintiffs had reviewed documents which were,

at the time, protected by ACC's attorney-client privilege. When this Court ultimately waived ACC's privileges, documents contained in the record herein became available to Plaintiffs. This action was brought within several weeks of the release of these documents.

### b. Expert Status

■ Jones Day further contends that it cannot be held liable under Section 11 because it did not issue an "expert" opinion. Section 11 applies to misleading statements made by one "whose profession gives authority to statements made by him." 15 U.S.C. § 77*k*. Jones Day concedes that its October 28, 1986 opinion letter was required by SEC Regulation S–K, which provides in part:

> (5) *Opinion Re Legality*—(i) An opinion of counsel as to the legality of the securities being registered, indicating whether they will, when sold, be legally issued, fully paid and non-assessable, and, if debt securities, whether they will be binding obligations of the registrant.

SEC Regulation S–K, Item 601( )(5).

The court holds that an attorney who provides a legal opinion used in connection with an SEC registration statement is an expert within the meaning of Section 11. *See Schneider v. Traweek*, 1990 WL 169856, 1990 U.S.Dist. LEXIS 15,563 (C.D.Cal. Sept. 5, 1990).

### 4. *Breach of Fiduciary Duty to Lincoln*

#### a. Statute of Limitations

Jones Day contends that claims for breach of fiduciary duty, brought by the RTC, are time-barred. RTC contends that its claims were preserved until the conservatorship was imposed.

■ Under the theory of adverse domination, the limitations period on a corporation's cause of action is tolled while wrongdoers control the corporation. *Bornstein v. Poulos*, 793 F.2d 444 (1st Cir.1986) (doctrine extends to attorney with fiduciary duty to corporation); *Fed. Sav. and Loan Ins. Corp. v. Williams*, 599 F.Supp. 1184 (D.Md.1984) (limitations statute tolled while corporation is dominated by wrongdoers). In this instance, ACC/Lincoln management would not have brought claims on behalf of ACC/Lincoln, for it would have brought their own misconduct to light. Furthermore, the court finds material questions as to whether Jones Day knowingly assisted in ACC's alleged fraud. Accordingly, it is equitable to toll the statute of limitations on Lincoln's behalf.

#### b. Validity of Claims

■ An attorney who represents a corporation has a duty to act in the corporation's best interest when confronted by adverse interests of directors, officers, or corporate affiliates. It is not a defense that corporate representation often involves the distinct interests of affiliated entities. Attorneys are bound to act when those interests conflict. There are genuine questions as to whether Jones Day should have sought independent representation for Lincoln. *See* Section V(F)(5), *infra.*

■ Moreover, where a law firm believes the management of a corporate client is committing serious regulatory violations, the firm has an obligation to actively discuss the violative conduct, urge cessation of the activity, and withdraw from representation where the firm's legal services may contribute to the continuation of such conduct. Jones Day contends that it would have been futile to act on these fiduciary obligations because those controlling ACC/Lincoln would not have responded. Client wrongdoing, however, cannot negate an attorney's fiduciary duty. Moreover, the evidence reveals that attorney advice influenced ACC/Lincoln's conduct in a variety of ways. Accordingly, summary judgment as to this claim is denied.

### 5. *Professional Negligence Claims*

■ Jones Day issued an opinion letter that was included with ACC's 1986 shelf registration statement. California authority provides that independent public accountants have a duty to those who are foreseeably injured from representations made in connection with publicly held corporations. While this duty does not extend to confidential advice which an attorney gives to its clients, it would apply where an attorney issues an SEC opinion letter to the public. *Roberts v. Ball, Hunt, Hart, Brown & Baerwitz*, 57 Cal.App.3d 104, 128 Cal.Rptr. 901 (1976); *see also Int'l Mortgage Co. v. Butler Accountancy Corp.*,

177 Cal.App.3d 806, 223 Cal.Rptr. 218 (4th Dist.1986).

Accordingly, a question of fact remains as to whether the *Yahr* Plaintiffs, who purchased bonds issued pursuant to the November, 1986 shelf registration and amendments, were injured by the Jones Day opinion letter.

### 6. *Section 12 Liability*

 Section 12 imposes liability only on those who offer and sell securities. 15 U.S.C. § 77*l*. The court concludes that Jones Day's contributions to the bond sales program were those of an expert consultant rather than those of an offeror or seller. Accordingly, Jones Day's participation is insufficient to impose Section 12 liability within the meaning of the Securities Act.

### E. CLASS PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT

#### 1. *RICO Elements*

Class plaintiffs argue that there are no issues of material fact as to the following elements of their RICO claims: (1) each plaintiff/defendant is a "person"; (2) ACC/Lincoln was an "enterprise"; (3) each defendant was "employed by or associated with" the enterprise; (4) the enterprise affected interstate commerce; and (5) each defendant participated, directly or indirectly, in the conduct of ACC/Lincoln's affairs through a pattern of racketeering activity.

 The essence of a RICO violation is an intent to defraud. The critical issues at hand are therefore knowledge or mindset, and causation. It is premature for the court to rule that Defendants are "RICO persons" who have participated in a "RICO enterprise" where the key issues of knowledge and intent have not been adjudicated. Neither the "person" nor "enterprise" requirements are centrally at issue here. These essentially neutral elements are not amenable to summary adjudication prior to determination of the principal issues of knowledge, intent, and causation.

### 2. *Collateral Estoppel Effect of the Conservatorship Action*

In 1989, in the District Court for the District of Columbia, ACC challenged FHLBB's appointment of a conservator and receiver for Lincoln Savings. It was that court's task to determine whether federal regulators acted arbitrarily and capriciously when they seized Lincoln on grounds that it was operating in an unsafe and unsound manner. The District Court thoroughly investigated four representative transactions through the vehicle of a mini-trial. Upon hearing the evidence, the court upheld the conservatorship and issued extensive findings. Plaintiffs argue that those findings should bind the defendants here.

 Once an issue is actually litigated and determined, that determination is conclusive in subsequent suits based on a different cause of action but involving a party or privy to the prior litigation. *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 326, 99 S.Ct. 645, 649, 58 L.Ed.2d 552 (1979); *Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979). Collateral estoppel bars relitigation of factual questions or mixed questions of fact and law. *See Brown v. Felsen,* 442 U.S. 127, 139 n. 10, 99 S.Ct. 2205, 2213 n. 10, 60 L.Ed.2d 767 (1979). This doctrine applies only in cases where issues were "actually litigated and necessary to the outcome of the first action." *Parklane Hosiery,* 439 U.S. at 326 n. 5, 99 S.Ct. at 649 n. 5; *Robi v. Five Platters, Inc.,* 918 F.2d 1439 (9th Cir.1990). The Restatement (Second) of Judgments sets out the general rule of collateral estoppel, or issue preclusion:

> When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim.

Rest.2d of Judgments § 27 (1982); *see also In re Lockard,* 884 F.2d 1171, 1174 (9th Cir.1989). Collateral estoppel, however, is a discretionary doctrine. The court must

consider both the potential prejudice to those who were non-parties to the first action, and the need for consistency. Fairness, however, must be the court's primary consideration. *See* Rest.2d of Judgments § 29.

 Of the parties presently before the court, only Keating could arguably be considered a party to the earlier conservatorship action.[6] The court concludes that the application of collateral estoppel would be inconsistent with the primary objective of fairness, and that the issues to be tried in this litigation differ in important ways from those before the court in the conservatorship action.

### 3. *Plaintiffs' Motion for Partial Summary Judgment on Sections 10(b), 11 and 12(2)*

The inclusion of false and misleading information in financial statements is an element of liability under Sections 10(b), 11, 12(2), fraud, and California Corporations Code Sections 1507 and 25401. Plaintiffs argue that a real estate sale by a Lincoln subsidiary to Westcontinental Mortgage and Investment Corporation ("Westcon") was indisputably a sham on which over $11 million of illegal profit was recorded. This sham income was included in the net profits reported in at least four 1987 SEC filings and associated registration statements and prospectuses. Therefore, plaintiffs conclude, this court should rule as a matter of law that these financial statements were materially false and misleading. In effect, plaintiffs contend that the "material misrepresentation" element of each of the above causes of action is amenable to summary judgment.

This motion is denied for many of the same reasons described with respect to plaintiffs' Motion for Summary Judgment on the RICO claims. *See* Section V(E)(1) of this Order, *supra.* In addition, the representations plaintiffs seek to adjudicate here are disputed. With the possible exception of the Section 11 claim against Arthur Young, misrepresentations concerning the

Westcon transaction, standing alone, may not be determinative of any defendants' liability. Material issues remain as to other elements of these claims that may be determinative, and thus must be adjudicated contemporaneously.

### 4. *Plaintiffs' Motion for Summary Judgment Against Jones Day*

The court concludes that a thorough presentation of the evidence to a jury is necessary. Therefore, this motion is denied.

## F. TROUTMAN, SANDERS, LOCKERMAN & ASHMORE

Troutman is a defendant in *RTC v. Keating.* RTC alleges claims based on breach of fiduciary duty, negligent misrepresentation, negligence *per se*, breach of contract, aiding and abetting breach of fiduciary duty, derivative liability, and direct liability. In its Motion for Summary Judgment, Troutman raises six issues. The court first addresses four fact-based claims applying to all counts. The other two claims raise legal arguments. In addition, defendant class representative Carl Sanders moves to dismiss for lack of personal jurisdiction.

### 1. *Lincoln Subsidiaries*

 Troutman takes issue with RTC's attempt to recover for claims more appropriately raised by the Lincoln subsidiaries. If loans made by Lincoln subsidiaries were funded by Lincoln, and Lincoln suffered the ultimate loss, Lincoln would be entitled to recover. This motion is therefore denied.

### 2. *ERISA Preemption*

 Troutman contends that RTC's allegations concerning the ACC ESOP are preempted by the Employee Retirement Income Security Act ("ERISA"). ERISA preempts state law governing rights and obligations as between employee retirement plans and plan participants. RTC's claims do not arise out of a relationship among or duty owed to ERISA plan partici-

---

**6.** The conservatorship challenge was brought by the ACC estate, while Keating was still Chairman of the Board, acting as debtor in possession.

pants. Rather, RTC asserts claims based on the violation of independent laws regulating independent rights and obligations. Accordingly, ERISA does not preempt the RTC's claim. *See* 29 U.S.C. §§ 1109, 1132 and 1144.

### 3. *Tax Sharing Agreement*

Troutman contends that a reasonable jury could not conclude that its tax advice conflicted with Lincoln's interests. The record contains contradictory evidence about the details and extent of Troutman's representation in the ESOP matter. The testimony of Lee Henkel (arguably Troutman's most significant figure with respect to this client), and of Scott Seibels of ACC, raise material questions of fact. Summary judgment is therefore inappropriate.

### 4. *The ESOP*

 Troutman argues that it had no reason to believe its opinions concerning the ESOP were wrong, and therefore no question of fact remains with respect to the ESOP representation. The issue on these matters, however, is not whether Troutman knew or should have known of ACC's fraud, but rather, whether Troutman failed to act in the face of a conflict of interest among its clients. The record raises questions concerning whether Troutman actually represented ACC (or Keating), rather than the ACC ESOP, despite the fact that Troutman was paid by Lincoln. A jury might reasonably conclude from the evidence that Lincoln's interests were not served when Lincoln guaranteed the Series B and C ESOP notes, and when Lincoln was subsequently made jointly and severally liable for the entire debt, as a result of an ESOP amendment drafted by Troutman.

The record further contains evidence that Troutman did contemporaneous research, billed to the ACC/Lincoln/ESOP account, concerning affiliated persons and trusts under the FHLBB regulations. Troutman was involved in meetings and phone calls during the ESOP negotiations, including discussions of the FHLBB controlling person and substantial benefit regulations. Moreover, the evidence reflects that Trout-

man knew Keating controlled the ESOP and that the ESOP lacked independence. In light of these disputed facts, summary judgment on this issue is inappropriate.

### 5. *Breach of Fiduciary Duty*

Troutman contends that its client was ACC, and that it performed highly circumscribed tasks. Lincoln Savings, however, paid many of Troutman's bills. Troutman partner Lee Henkel testified that the firm generally represented Lincoln, in addition to other entities, and that at no time was that representation terminated. Henkel also testified that Troutman did not attempt to distinguish among ACC, Lincoln, the ACC ESOP, or the Lincoln subsidiaries, for purposes of its representation.

 A law firm must fully inform clients about risks associated with joint representation. For example, ER 1.7 provides:

> A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:
>
> (1) the lawyer reasonably believes the representation will not be adversely affected; and
>
> (2) the client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved. (Emphasis added).

E.R. 1.7. A client's implied consent is insufficient to waive a potential conflict of interest. Moreover, where the consent is explicit, an attorney cannot represent a client in a conflict situation unless the attorney reasonably believes that the representation of one client will not adversely affect the representation of the other.

The evidence raises genuine questions as to whether a conflict existed at the time Troutman provided legal services on the tax sharing agreement, the ESOP, the Hotel Pontchartrain Limited Partnership, and

the Lee Henkel blind trust.[7] Each situation raises an issue as to whether ACC placed Lincoln's assets at risk, and whether Troutman should have recognized—with the exercise of due care—the potential detriment to its client, Lincoln.

### 6. *Negligence Per Se*

■ RTC seeks a finding of negligence *per se* arising out of violations of the Professional Code of Responsibility or under 12 C.F.R. § 563.18. The Professional Code, however, does not form the basis for civil liability. Rather, it is the attorney's fiduciary duty which forms the basis of liability. The Professional Code provides guidance as to the standard of care. The Georgia courts have held: [8]

> It is the general rule in the majority of states that in a legal malpractice action, the client has the burden of establishing three elements: (1) employment of the defendant attorney, (2) failure of the attorney to exercise ordinary care, skill and diligence, and (3) that such negligence was the proximate cause of damage to the plaintiff.

*Roberts v. Langdale*, 185 Ga.App. 122, 363 S.E.2d 591 (1987).

RTC must prove that its injuries were proximately caused by Troutman's negligent misrepresentation or breach of duty. In the court's view, therefore, the negligence *per se* count adds little to RTC's complaint.

### 7. *Carl Sanders*

This court previously certified a class of all Troutman partners. Carl Sanders was designated as class representative. Sanders argues that although the court may have jurisdiction over the Troutman law firm, this does not impart personal jurisdiction over him as an individual.

Troutman represented Arizona-based ACC/Lincoln for over five years on business matters emanating from Arizona. The Troutman partnership has, therefore,

"purposefully availed itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958)).

The Troutman defendant class was certified on the basis that the members of a partnership are jointly and severally liable for the actions of partners committed during the ordinary course of partnership business. *See In re Alexander Grant & Co. Litigation*, 110 F.R.D. 528 (S.D.Fla.1986). [C]ertification of defendant classes has become increasingly common. *Id.*

Liability of the Troutman partner class would be unaffected by their own personal knowledge or involvement in the circumstances of the ACC/Lincoln representation. The claims against Sanders are typical of those against the class. He is representative of a group of partners who, as agents of their partnership, may be vicariously liable for the conduct of the partnership. The court has jurisdiction over Sanders as an agent of the partnership. Thus, the court does not purport to exercise personal jurisdiction over Carl Sanders based on any personal conduct unrelated to Troutman's representation of ACC/Lincoln.

If Troutman and/or Sander's contend that Sanders cannot adequately represent the interests of the class, they may move for designation of a new class representative. Dismissal of neither Sanders nor the claims against the partnership are warranted, however. Accordingly, Sander's Motion to Dismiss is Denied.

### G. FIRST BANK NATIONAL ASSOCIATION

■ In *RTC v. Keating*, the RTC alleges claims against First Bank National Association under RICO, AZRAC, fraud, conspiracy, and aiding and abetting breach of fiduciary duty. These claims arise out of

---

**7.** Henkel was named to the Federal Home Loan Bank Board. Henkel's assets were placed in a "blind trust" and their disposition is at issue in this litigation.

**8.** Troutman is a Georgia partnership.

First Bank's services as ESOP trustee. The evidence is summarized below.

Prior to September 1985, First Bank administered indenture trusteeships for several ACC subsidiaries. Dennis Pederson was the principal contact with ACC, although he had no contact with Keating. In February 1984, First Bank first learned of the purchase of Lincoln by ACC. Pederson testified, "From my standpoint, as a fully secured fiduciary on the bond issues, I really saw no—no real change in business. Everything was business as usual. All bond issues were secured by Ginny Mae."

In September 1985, Pederson was contacted by ACC President Judy Wischer to inquire about First Bank's ability to serve as ESOP trustee. Pederson referred Wischer to Karl Schroeter, Vice President in charge of administering qualified employee benefit plans. Schroeter contacted Wischer, and was at that time informed that Troutman was ESOP counsel, and that ACC was negotiating with Bankers Trust for an ESOP loan of $10-20 million. Schroeter's handwritten notes memorialize the conversation. They state in part:

> They want a trustee who can handle all the record keeping and distributions. Judy will send copy of ESOP documents. L/C collateral to be put up by subsidiary of Lincoln S & L; guarantor will be service corp of Lincoln S & L, ESOP and ACC.
> Stock purchase will be on open market—may buy 3-5 M from insiders.
> Possibly use 401(k) test routine to identify contributions approaching 3% level.
> Top heavy report annually.
> Important page.

According to Schroeter's later testimony, he marked the page as "important" because it set out key recordkeeping issues for the trustee. Certain specialized recordkeeping was required by the ESOP trustee because the ESOP was "top heavy"—a term significant under the Internal Revenue Code.

In October 1985, Schroeter went to Phoenix to meet with Wischer and ACC controller, Lynn Borushko. Schroeter testified that he did not know the members of the ESOP plan administrative committee at that time because they had not yet been appointed. An "ESOP Working Group" list, dated October 21, 1985, reflects First Bank as the ESOP trustee. On October 25, 1985, Schroeter requested an amendment to the ESOP plan to indicate that First Bank would be a directed trustee. Directed trustees are primarily recordkeepers and transaction handlers, rather than decision makers. Schroeter testified that First Bank did not accept trusteeships unless they were directed, a fairly common practice. On November 14, 1985, First Bank was formally named as ESOP trustee.

A November 15, 1985 resolution by ACC reflects the appointment of Margaret Wong, Richard Bertsch, and James Millican II as members of the ESOP Plan Administrative Committee. RTC offers evidence of the committee members' affiliations with ACC. The record contains no evidence demonstrating First Bank's knowledge of these affiliations. Schroeter later testified that he personally had never talked to Wong, Bertsch or Millican, and had no knowledge of their backgrounds. The evidence reveals that Wong, Bertsch, and Millican may have breached their duties to the ESOP plan. Again, however, there is no evidence raising genuine questions concerning whether First Bank knew of those breaches.

On November 21, 1985, Schroeter attended the closing of the Bankers Trust loan. Schroeter reviewed documents with Troutman attorney Ira Leff to ensure there were no missing papers. First Bank signed a statement, which provided in part:

> First Bank has examined and reviewed all relevant facts and circumstances pertaining thereto and determined that the loan and purchase of the common stock of ACC with the proceeds thereof is primarily for the benefit of participants and beneficiaries of the ESOP.

Schroeter further testified that First Bank did no independent analysis, but relied on representations that the $20 million loan was to benefit plan participants. The court finds this, when viewed in conjunction with

other evidence in the record, insufficient to raise an inference of reckless scienter.

RTC suggests that an ESOP amendment which effectively gave Keating his ESOP distribution at age 62 should have put First Bank on notice of fraud. Again, the evidence fails to show that First Bank was aware that this amendment was solely for Keating's benefit. Moreover, the record contains no evidence demonstrating that First Bank should have considered this amendment to be unusual.

The record further reflects that ACC insiders originally planned to terminate the ESOP once it had purchased the insiders' stock. A February 4, 1986, ACC memo cautions "approach [First Bank] carefully with support of [Troutman]—sale of so much stock could raise red flags." There is no evidence that First Bank was aware of ACC's intention to terminate the ESOP, nor that First Bank was ever approached by ACC personnel. Rather than terminate the entire ESOP, ACC ultimately decided to pay off a $1.8 million loan to Valley National Bank. There is no evidence that this payment should have put First Bank on notice of wrongdoing by ACC.

The court finds the evidence presented against First Bank insufficient to sustain a racketeering claim under state or federal law. The count alleging aiding and abetting breach of fiduciary duty was dismissed for reasons described earlier in this opinion. Accordingly, First Bank's motion for summary judgment is granted.

## H. INDUSTRIAL INDEMNITY

In *Frey v. Hotel Ponchartrain Ltd. Partnership,* unresolved claims remain only between H. Garrett Frey and Industrial Indemnity. Plaintiff Frey was a limited partner in the Hotel Ponchartrain Limited Partnership ("HPLP"), alleged to have been one aspect of the fraudulent scheme devised by Keating and other defendants. Frey advanced $10,000 on a $200,000 investment. Frey alleges that the partnership was funded by illegal loans provided by Lincoln Savings, and that he was induced to invest through misrepresentations about the strength of Lincoln and

the value of the Hotel Ponchartrain. Industrial Indemnity issued the surety bond which guaranteed payment of Frey's limited partnership note. Frey alleges that Indemnity issued the surety bonds with knowledge of the alleged fraud, and that the bonds were necessary for the Hotel Ponchartrain transaction to proceed. The claims against Industrial Indemnity are based on Section 10(b), RICO, AZRAC, common law fraud, and negligent misrepresentation. In addition, Industrial Indemnity filed a crossclaim against Frey for payment on his promissory note. Industrial Indemnity moves for summary judgment both on the complaint and its crossclaim.

Frey contends Indemnity was concerned about illegality from the outset. The evidence and testimony in the record, however, suggest that Industrial Indemnity's actions were motivated by tax concerns. An April 8, 1985 memorandum outlines Indemnity's initial decision to decline to act as surety. The memo provides, "Outside guidelines in two areas: (1) mark up to partnership was 43%, (2) mortgage financing was not acceptable." The deposition testimony is that Indemnity questioned whether the Internal Revenue Service would grant all tax deductions sought in the sophisticated investor tax shelter. ACC therefore provided a legal opinion addressing the tax concerns, prepared by Troutman, and a Tax Indemnification Agreement, pursuant to which ACC guaranteed up to 20% of any investor note which went into default due to adverse tax determinations. Industrial Indemnity regarded this as a measure of ACC's confidence in the venture and this, coupled with Indemnity's favorable impression of Nicholas Klotz, who was to run the hotel, led it to agree to act as surety.

Frey offers as evidence that Indemnity colluded with ACC an April 23, 1985 document entitled "Summary of Industrial Indemnity Meeting." This document was written by ACC's James Upchurch. The memorandum summarizes discussions about tax-related issues and Indemnity's request for an "as is" appraisal. The memorandum does not demonstrate that Indem-

nity received or discussed inside information about the alleged fraud, however.

Frey argues that the Troutman opinion letter addressing Indemnity's tax concerns put the surety on notice that the HPLP transaction was illegal. The last paragraph states:

We share your concern, however, that the total financing encumbering the building (recourse note of $8 million and non-recourse of $30 million) exceeds the $36,677,207 purchase price and the $37 million valuation. This inconsistency was created by savings and loan regulations which prevented Lincoln Commercial from making a direct loan to the Partnership. Thus, the lender could not make a separate loan to the Partnership in order to fund the fees and other payments due to the General Partner.

When viewed in the context of this record, the court concludes this statement about savings and loan regulations is insufficient to raise a question about whether Industrial Indemnity acted with knowledge of the alleged fraud, or in reckless disregard of its existence.

Frey further argues that Indemnity knew that the March 29, 1985 appraisal was grossly overstated. On April 26, 1985, an "as is" appraisal valued the Hotel Pontchartrain at $22 million. The evidence reflects that the appraisal was based on a $22 million "as is" value, $9 million for renovations, and a $6.2 million, or 20%, entrepreneur's profit for risks and costs of turnaround. The testimony is that after meeting with Nicholas Klotz, Indemnity was convinced that a 20% entrepreneur's fee was reasonable. The record therefore does not support a finding that this appraisal put Indemnity on notice of the underlying fraud.

A July 23, 1985 note by ACC's Upchurch entitled "Review of Inducement Agreement" provides that the payee or assignee should not be the Partnership itself. Frey offers this as evidence that Indemnity conceived of creating a new third-party corporation to receive the investor notes in order to conceal the Lincoln affiliation. However, the testimony of both officers of

Credit Lyonnais (the lender) and ACC's James Conner is that the idea originated with Credit Lyonnais or their attorneys.

Frey submits an affidavit from his attorney concerning discussions with defendant Mark Sauter, held prior to Sauter's assertion of his Fifth Amendment privilege. According to the affidavit, Sauter informed counsel that he was the ACC officer responsible for complying with bank regulations. Sauter states that upon learning that the HPLP financing violated savings and loan regulations, he urged that the investor notes be refinanced. Frey argues that this affidavit, coupled with Upchurch's note in the margin of the April 23, 1985 meeting summary—"discuss w/Sauter on loan to affiliate issues"—demonstrates that Indemnity understood the refinancing was designed to conceal the illegality. Again, however, the record shows only that Indemnity's attention was focused on tax issues. Furthermore, the record contains no evidence showing that Upchurch communicated Sauter's statements to Indemnity.

Frey argues that a chart in the HPLP private placement memorandum indicates that Insurance West, an affiliate of ACC, was Indemnity's agent on the HPLP suretyship. Frey argues that Insurance West's knowledge should therefore be imputed to Industrial Indemnity. The court finds the evidence insufficient to support this assertion.

The record contains a sworn declaration from Indemnity's agent that it neither knew about nor participated in fraud underlying HPLP, that the surety was originally declined because of concerns about tax issues and ACC's inexperience as a hotel manager, and that Indemnity changed its position after receiving financial assurance from ACC, the Troutman opinion letter, and the meeting with Nicholas Klotz. These declarations are uncontested, except insofar as a jury could draw contrary inferences from the evidence described. The court concludes that the evidence is insufficient to support a finding that Indemnity knew or recklessly disregarded fraud in connection with the Hotel Ponchartrain. Moreover, the evidence

does not show that Frey relied on representations by Indemnity when making his investment decision.

In its motion, Indemnity argues that Frey—a sophisticated investor who sold HPLP limited partnerships—signed an absolute, unconditional, investor reimbursement agreement. In this agreement, Frey promised to reimburse Indemnity if they paid as a result of Frey's default on the obligation. The record contains neither allegations nor facts demonstrating that Industrial Indemnity committed any wrongdoing in paying off the note when Frey defaulted. Accordingly, Industrial Indemnity's motion on the complaint is granted, as is its motion on the crossclaim.

## I. OFFERMAN AND COMPANY

Offerman, a defendant in *Shields* and *Roble*, underwrote debentures and stock issued by ACC in 1986 and 1987. Offerman raises a series of legal arguments which are addressed briefly here.

■ First, Offerman argues that the plaintiff class has no standing under Sections 10(b), 11, and 12, because there is not a named plaintiff representing each of the different securities at issue. The court concludes that plaintiffs need not name a representative of the class for each subgroup of securities, where common issues predominate as to all securities. Offerman further argues that class representatives Herbert and Myrtle Bladh are not real parties in interest because their securities are held in trust for the benefit of their children. Offerman argues that the real party in interest is the holder of record—Star Bank. In response, the Bladhs assert that they are the trustees, and as such control investment decisions. The court therefore rejects Offerman's argument.

■ Second, Offerman argues that the Section 10(b) claims must be dismissed because the Bladhs did not buy from Offerman, but rather from plaintiff Frey. Section 10(b) requires that a misrepresentation made in connection with the purchase or sale of a security, but does not require that the plaintiff purchased the securities from the defendant who contributed to the misrepresentation. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 731–32, 95 S.Ct. 1917, 1923, 44 L.Ed.2d 539 (1975).

Third, Offerman contends that the Section 11 and 12 claims are time-barred. Plaintiffs concede that there is no Section 12(1) liability for unregistered sales of securities. Plaintiffs further concede that claims arising from pre-March 26, 1987 offerings—Section 11—and buys—Section 12(2)—are barred. Accordingly, no Section 11 or 12 liability can be imposed for debt offerings made prior to March 26, 1987. However, purchasers of cumulative convertible preferred stock are not time-barred. The registration statement became effective on May 19, 1987. Motion for leave to file Plaintiffs' Fifth Amended Complaint, filed March, 1990, was granted on May 18, 1990.

■ Fourth, Offerman argues that Section 12 liability is limited to sellers, and therefore is inapplicable here. The court concludes that Offerman is a Section 12 seller under *Pinter v. Dahl*, 486 U.S. 622, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988) (when broker acts as agent of principal in soliciting a purchase, he is person from whom buyer purchases within meaning of § 12); and *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531 (9th Cir.1989).

Fifth, Offerman claims that its liability is limited to securities sold pursuant to registration statements in which it participated as broker/dealer. Plaintiffs, however, make no claim for liability under Section 11 for offerings which Offerman did not underwrite.

■ Sixth, Offerman argues that there is no evidence to support controlling person liability for Joseph Offerman or Scott Offerman. Corporate officers are jointly and severally liable for securities law violations by persons under their control. 15 U.S.C. § 78t(a).[9] *Hollinger v. Titan Capital*

---

**9.** The Code of Federal Regulations defines "control" as:

"[T]he possession, direct or indirect, of the power to direct or cause the direction of the

*Corp., supra.* The court rejects this argument with respect to Joseph Offerman due to his authority to direct the management and policies of Offerman & Co.

With respect to claims under 10(b), RICO, AZRAC, and the California Corporations Code, the court concludes that the record lacks evidence sufficient to support a finding that Offerman's conduct was a substantial factor in permitting the sale of subordinated debentures in California. Unlike other defendants who engaged in activities with arguably global impact on ACC/Lincoln's financial image, Offerman's involvement was limited to representations made in connection with its own securities. Although plaintiffs contend that the proceeds from Offerman underwritten securities fueled the bond sales in California, no evidence was offered on this point. Accordingly, summary judgment is granted as to securities not underwritten by Offerman.

With respect to Offerman underwritten securities, the record raises material questions concerning violations of securities laws, RICO and fraud. Evidence demonstrating Offerman's knowledge of the primary violation of securities law includes, but is not limited to, the following documents produced from Offerman's files: a January 1987 letter from the FHLBB that lists Lincoln regulatory violations, and a February 1987 letter from the California Department of Savings and Loan outlining its compliance concerns. In February 1987, Offerman's Virgil Rolfsrud wrote:

> Their not having disclosed these letters to us voluntarily is basis enough for not proceeding [with the underwriting] ... certain treatments of interest and appraisals used on bad loans are very troubling ... Phoenician Hotel situation should be examined in detail. It's a hell of a big asset—$214 million with appraised loss by FHLBB of $80 million. What's going on?

Despite Rolfsrud's concerns, Offerman proceeded with the underwriting, drafting the prospectus with little or no due diligence. The record further reveals that in late 1986 or early 1987, Offerman accepted a $1 million payment from Keating. A portion of this, $400,000, was paid to Offerman & Co. and $600,000 was paid directly to Joseph Offerman. Offerman, however, did not disclose his portion. Offerman contends that the undisclosed payment was a placement fee for his introduction of Allegheny Beverage Corporation ("Allegheny") to ACC in early 1985. Allegheny borrowed $25 million from ACC, on terms which brought $5 million in profits to ACC. The timing and amount of the payment to Offerman raises questions about its purpose, however. The payment was made 18 months after the ACC–Allegheny transaction had closed, and one year after ACC had been repaid. Offerman argues that a 4% placement fee is standard, but this does not explain why the $1 million was paid by Keating rather than Allegheny. Although the amount paid to Offerman represented 4% of ACC's loan to Allegheny, it represented 20% of ACC's profit.

Moreover, the evidence presented to this court raises material issues about whether the Offerman prospectus was misleading, and whether Offerman participated in a fraudulent course of conduct with respect to the securities it underwrote. Accordingly, Offerman's motion for summary judgment is granted in part and denied in part.

### J. SOCIETE D'ANALYSES ET D'ETUDES BRETONNEAU

Saudi European Bank ("SEB") is a defendant in *Shields* and *Roble*, as a result of certain transactions with ACC during 1986–1987. After ACC's bankruptcy in April 1989, SEB was sold to Societe de Banque Privee, and ultimately came to be known as Societe D'Analyses et D'Etudes Bretonneau ("Bretonneau"). Bretonneau seeks summary judgment on two grounds. First, Bretonneau argues, the adverse agent doctrine precludes imputation of the alleged guilty mindset of SEB employees to the

---

management and policies of a person, whether through ownership of voting securities, by contract, or otherwise."

17 C.F.R. § 230.405.

bank itself. Second, the sale of SEB was a French act of state which insulated Bretonneau from successor liability.

### 1. *Adverse Agent Doctrine*

 Under the adverse agent doctrine, where an agent secretly acts entirely for his or her own benefit, the agent's knowledge is not imputed to the principal. Restatement (Second) of Agency § 282 provides:

**Section 282. Agent Acting Adversely to Principal**

(1) A principal is not affected by the knowledge of an agent in a transaction in which the agent *secretly* is acting adversely to the principal and *entirely* for his own or another's purposes, except as stated in Subsection (2).

(2) The principal is affected by the knowledge of an agent who acts adversely to the principal:

(a) if the failure of the agent to act upon or to reveal the information results in a violation of a contractual or relational duty of the principal to a person harmed thereby;

(b) if the agent enters into negotiations within the scope of his powers and the person with whom he deals reasonably believes him to be authorized to conduct the transaction; or

(c) if, before he has changed his position, the principal knowingly retains a benefit through the acts of the agent which otherwise he would not have received.

Rest.2d of Agency § 282. (Emphasis added.) This doctrine, however, does not apply where a corporation benefits from the agent's conduct, even when the net result may be detrimental to the corporation's interests. Rest.2d of Agency § 282(2)(b), *supra*. The "exception to the general rule is applicable only in cases where an agent is stealing from the corporation or otherwise defrauding it." *Funk v. Tifft*, 515 F.2d 23, 26 n. 4 (9th Cir.1975) *citing* Restatement (Second) of Agency § 282, comment *c* & illustration 4 at 613 (1985).

Nor does the doctrine shield a corporation where an agent injures innocent third parties. As between the corporate princi-

pal and the third party, the corporation is in a better position to control the agent's misconduct. *Elfstrom v. New York Life Ins. Co.*, 67 Cal.2d 503, 63 Cal.Rptr. 35, 432 P.2d 731 (1967); *State Farm Fire & Casualty Co. v. Sevier*, 272 Or. 278, 537 P.2d 88 (1975).

 The record generally does not support a finding that the adverse agent doctrine shields Bretonneau as a matter of law. SEB's agents did not act secretly. They openly approved loans based on Keating's verbal guarantee, over objections by SEB's Paris Credit Committee. Moreover, as between SEB and plaintiffs, SEB was in a better position to control its agents. And finally, although Fenn and Radwan's motives may have been entirely self-serving, SEB arguably benefitted from the transactions with ACC.

Cases cited by SEB do not mandate a different result here. For example, in *Federal Deposit Ins. Corp. v. Lott*, 460 F.2d 82 (5th Cir.1972) (en banc), the court would not impute an agent's knowledge where "none of the corporation's other officers or directors knew about the agent's fraudulent acts," and, in addition, "[i]nnocent shareholders and creditors should not have to bear a loss."

Accordingly, there are genuine questions which preclude summary judgment for Bretonneau on this defense.

### 2. *Act of State Doctrine*

 Bretonneau further argues that this court must recognize, under the Act of State Doctrine, that the French government insulated Bretonneau from successor liability. The Act of State doctrine confers presumptive validity on certain acts by foreign sovereigns by rendering non-justiciable claims that challenge such acts. The key inquiry is whether the action was by authority of the sovereign, and if so, whether the sovereign acted in the public interest.

Bretonneau relies on two experts, French banking law Professor Jean Stoufflet and international law Professor Boris Kozolchyk. Stoufflet opines that the French

handle bank failures very differently than does the United States. In the event of a troubled institution, the Bank of France, pursuant to Article 52 of the 1984 Banking Law, will "invite" other banks to provide the necessary financial support. Because SEB was a foreign institution, Stoufflet suggests, French banks were reluctant to do so. Therefore, the Banking Commission demanded that SEB be sold. The recent failure of two other Arab-owned banks motivated the Commission to act discretely, as they feared the public alternative, a judicial wind-up under French law, would damage the reputation of the French banking system.

Professor Kozolchyk concludes that the sale of SEB to Societe Banque Privee, and its subsequent restructuring as Bretonneau, were analogous to the bridge bank device employed in the United States by the Federal Deposit Insurance Corporation. *See* 12 U.S.C. §§ 1821, 1823. Kozolchyk argues that Bretonneau is entitled to protections analogous to those of the *D'Oench Duhme* doctrine, which insulates a bank from liability for claims arising out of agreements which are not documented in the bank's books and records.

Regulatory supervision over SEB by the French Banking Commission is well-documented. Evidence in the record reflects that the Banking Commission invoked Article 52 in 1988. Later, the Banking Commission made open and pointed remarks about the bank's precarious financial position, urging that the bank be sold and threatening liquidation. When SEB announced a potential buyer, the Banking Commission facilitated negotiations.

 For the Act of State Doctrine to apply, the validity of the act performed by the foreign sovereign must be at issue. *W.S. Kirkpatrick & Co. v. Env't Tectonics Corp., Int'l*, 493 U.S. 400, 110 S.Ct. 701, 107 L.Ed.2d 816 (1990). Here, the ultimate issue is not whether the French government supervised, facilitated, or required the sale. The issue is whether a government act insulated the purchasers from successor liability. In June 1991, the Bank of France approved the proposed restructuring of SEB. With respect to liabilities, the evidence in the record describes the terms of the restructuring as follows:

★ to make the European operation into a separate entity, the company S.F.P.B., a corporation with capital of 250 million francs, which would retain its company name and would be in charge of developing the business generated by its new shareholders;

★ to keep the assets and liabilities related to American operations in the current company, whose name would be changed to S.A.E.B. and which—upon completion of the plans discussed in the preceding paragraph—would be responsible only for the fulfillment of obligations already in progress and would not execute any new banking operations.

These comments alone do not appear to insulate Bretonneau from liability for acts of the prior bank. Rather, the approval divides the bank into a banking entity and a liquidating entity, both of which remain under Bretonneau's control. Moreover, plaintiffs were precluded from taking discovery concerning the terms and conditions of the sale and restructuring, because of assurances by Bretonneau's former counsel that it was "the same bank." For these reasons, Bretonneau's motion for summary judgment is denied.

## K. ACCOUNTANT DEFENDANTS

 Arthur Andersen, Arthur Young, and Touche Ross offer various legal arguments which are briefly addressed here.

The accountants first argue that the federal RICO claims must be dismissed, as there is no evidence that they "conducted" a racketeering enterprise. 18 U.S.C. § 1962(c) provides, in pertinent part:

It shall be unlawful for any person ... to conduct or participate, directly or indirectly, in the conduct of such enterprises affairs through a pattern of racketeering activity....

The court rejects this argument, as the plain wording of the statute states that participation in the conduct of an enterprise's affairs is sufficient. Arizona courts look to federal RICO case law when construing and applying AZRAC. *Baines v. Superior Court of County of Pima*, 142

Ariz. 145, 149, 688 P.2d 1037 (App.1984). Thus, arguments made with respect to AZRAC are rejected as well.

■ The accountants further assert that a claim for racketeering cannot stand because they did not participate in the actual sale of securities. They argue that the RICO predicate act—fraud in the sale of securities—requires participation in the actual sale. Defendants argue that this must be distinguished from "fraud in connection with the sale of securities" under Section 10(b). The court rejects this argument as inconsistent with the majority view. *See Laird v. Integrated Resources, Inc.*, 897 F.2d 826 (5th Cir.1990); *In re Phillips Petroleum Sec. Litig.*, 881 F.2d 1236 (3d Cir. 1989); *see also Jett v. Sunderman*, 840 F.2d 1487 (9th Cir.1988).

■ The accountants argue the plaintiffs cannot prove a causal connection between the defendants' conduct and their losses. Plaintiffs must prove a direct relationship between the conduct alleged and the injury asserted. *Holmes v. Securities Investor Protection Corp.*, —— U.S. ——, 112 S.Ct. 1311, 1318, 117 L.Ed.2d 532 (1992). Plaintiffs need not rely on predicate acts of mail or wire fraud, however. *United States v. Goldberg*, 455 F.2d 479, 481 (9th Cir.), *cert. denied*, 406 U.S. 967, 92 S.Ct. 2411, 32 L.Ed.2d 665 (1972). In addition, the court has ruled that a presumption of reliance is available to these plaintiffs. *See*, Section I, p. 1433, *supra*.

The accountants next argue that RICO is unconstitutionally vague. This position has been rejected by the Ninth Circuit Court of Appeals. *United States v. De Rosa*, 670 F.2d 889 (9th Cir.), *cert. denied*, 459 U.S. 993, 103 S.Ct. 353, 74 L.Ed.2d 391 (1982).

■ The accountants cite *Bertrand v. IDA*, 1990 Bus. Disputes Guide (CCH) 7667, 1990 WL 264525 (D.Ariz.1990) for the proposition that the RICO claims cannot be sustained against members of the accounting partnerships. This argument is rejected as *Bertrand* concerned a corporation rather than a partnership.

■ The accountants further contend that choice of law rules preclude plaintiffs from stating the majority of their claims under California law, while also asserting a claim under Arizona's racketeering statute. ACC/Lincoln was headquartered in Phoenix, the accountants worked out of Phoenix offices, and the bond sale proceeds were wired to Phoenix. The court concludes Arizona has an interest in redressing wrongs from within, even on behalf of nonresidents, because of the state's interest in protecting the integrity of its businesses. *State ex rel. Corbin v. Pickrell*, 136 Ariz. 589, 667 P.2d 1304 (1983) (en banc). This interest does not conflict with California's interest in enforcing its securities laws. Concurrent enforcement does not necessitate inconsistent results and is not unwarranted where wrongdoing involves both states.

■ The accountant defendants argue that there is insufficient evidence of reliance with respect to the majority of *Yahr* plaintiffs. The court rejected summary judgment on the ground that questions of fact concerning direct and/or indirect reliance exist with respect to many plaintiffs. *Comm. on Children's Television, Inc. v. General Foods Corp.*, 35 Cal.3d 197, 197 Cal.Rptr. 783, 673 P.2d 660 (1983); *Panzirer v. Wolf*, 663 F.2d 365 (2d Cir.1981), *vacated Price Waterhouse v. Panzirer*, 459 U.S. 1027, 103 S.Ct. 434, 74 L.Ed.2d 594 (1982); *see also Bonhiver v. Graff*, 311 Minn. 111, 248 N.W.2d 291 (1976). Indirect reliance may be shown in a professional negligence case where purchasers are the foreseeable recipients of a defendant's work.

Arthur Young seeks a ruling that it is not, as a matter of law, responsible for the injuries of pre-opinion and post-resignation purchasers. The court rejects this contention for three principal reasons. First, liability under Section 10(b) and RICO does not necessarily flow exclusively from the issuance of an audit opinion. The court finds material questions concerning Arthur Young's participation beyond conducting an annual audit. *Blake v. Dierdorff*, 856 F.2d 1365 (9th Cir.1988). Second, Arthur Young and Jack Atchison's association with ACC predated its acceptance of the audit engagement with ACC. The court declines to draw time-period limitations in the face of a continuum of conduct. Third, ques-

tions remain as to whether Arthur Young's failure to withdraw its audit opinions constituted substantial assistance to the bond sales after Arthur Young had withdrawn from the engagement.

## L. PHILLIPS

Defendant Gene Phillips' motion for summary judgment is denied, as the court concludes that there are materials questions of fact which preclude summary judgment.

### CONCLUSION

Accordingly, this Memorandum Opinion affirms the court's Order of February 14, 1992 granting and denying summary judgment.

A final decision having been rendered, IT IS ORDERED AND ADJUDGED that Judgment is hereby entered in favor of STAR BANK and in favor of FIRST BANK NATIONAL ASSOCIATION, with each party to bear their own costs. IT IS FURTHER ORDERED AND ADJUDGED that judgment is hereby entered in favor of INDUSTRIAL INDEMNITY CORP. and against H. GARRETT FREY, with each party to bear their own costs.